## Butcher *v.* Bloom.

440

Argued April 7, 1964. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Arthur E. Newbold, III,* with him *Carter R. Buller, Tyson W. Coughlin, Edward E. Russell* and *Eugene F. Waye,* for petitioners.

*George T. Kelton,* with him *Jack Sirott,* for intervenors.

*Walter E. Alessandroni,* Attorney General, with him *Edward Friedman,* Deputy Attorney General, for Commonwealth.

OPINION BY MR. JUSTICE ROBERTS, September 29, 1964:

I

At issue in this litigation is the constitutional validity, under the Fourteenth Amendment to the Federal Constitution of the present apportionment of seats in both houses of the Pennsylvania Legislature.

On March 30, 1962, plaintiffs, Pennsylvania taxpayers and electors, filed complaints in equity in the Court of Common Pleas of Dauphin County against

the Secretary of the Commonwealth. The complaints sought that defendant be restrained from taking any steps toward the holding of elections for state legislative offices under the provisions of the existing apportionment acts[1] on the ground that the acts violated certain provisions of the Pennsylvania and Federal Constitutions.[2] After an answer was filed by defendant, plaintiffs moved for judgment on the pleadings. The motion was denied on June 13, 1962. However, the court of common pleas retained jurisdiction of the action, held the issues concerning reapportionment to be justiciable, and refused to adjudicate them until the Legislature had an opportunity to enact appropriate legislation at its forthcoming sessions.[3] On November 12, 1963, a special session of the General Assembly was convened for the purpose of considering reapportionment legislation. Subsequently, two reapportionment bills, the Act of January 9, 1964, No. 1, P. L. (1963) 1419, 25 P.S. §2221 (Supp. 1963), and the Act of January 9, 1964, No. 2, P. L. (1963) 1432, 25 P.S. §2217 (Supp. 1963), were passed and approved by the Governor.[4]

On January 14, 1964, plaintiffs petitioned the Supreme Court of Pennsylvania to take immediate jurisdiction of this case, and on January 15 we granted

---

[1] Act of May 10, 1921, P. L. 449, as amended, 25 P.S. §2201 (pertaining to the apportionment of Senate districts) ; Act of July 29, 1953, P. L. 956, 25 P.S. §2215 (pertaining to the apportionment of House districts).

[2] The complaint in this action was amended on December 13, 1963, to include an attack on Sections 16 and 17 of Article II of the Pennsylvania Constitution as well as upon proposed senatorial and representative reapportionment bills pending in the Legislature. On February 4, 1964, plaintiffs filed their second amended complaint which clarified the issues raised.

[3] *Butcher v. Trimarchi*, 28 Pa. D. & C. 2d 537 (C.P. Dauphin Co. 1962).

[4] Act No. 1 provides for apportionment of the House, Act No. 2 of the Senate.

plaintiffs' petition and issued a Special Writ of Certiorari to the Court of Common Pleas of Dauphin County. We also permitted intervention by two residents of Bucks County who filed a separate complaint averring, inter alia, that the First Legislative District of Bucks County is not compact within the meaning of Article II, §17, of the Pennsylvania Constitution and that they are denied fair and equal representation as required by §1 of the Fourteenth Amendment to the Constitution of the United States. On January 24, 1964, we remanded the matter to the Dauphin County court with directions to hold a hearing forthwith, to allow any pertinent amendment and any proper intervention, to make all necessary and appropriate findings of fact, and to remit its findings and report to this Court as expeditiously as possible. On March 19, 1964, after several hearings in that court, the hearing judge filed a report and findings of fact. On April 7, 1964, oral argument was held before this Court.

## II

In considering this case, we are aware that a similar proceeding was instituted in the United States District Court for the Middle District of Pennsylvania on November 22, 1963.[5] On April 9, 1964, that three-judge court filed findings of fact, conclusions of law, and an opinion holding the Pennsylvania Reapportionment Acts of January 9, 1964, and certain provisions of the Pennsylvania Constitution to be violative of the Fourteenth Amendment to the Federal Constitution. Accordingly, it enjoined various state officials from conducting elections pursuant thereto. That court retained jurisdiction of the matter pending enactment of a valid reapportionment plan by the General Assembly or, in default thereof, by its own decree or in some other lawful manner. At the same time, it announced that it would reconvene in Philadelphia on

---

[5] *Drew v. Scranton,* 229 F. Supp. 310 (M.D. Pa. 1964), appeal docketed, 33 U.S.L. Week 3047 (U.S. June 19, 1964) (No. 201).

June 1, 1964, to consider any further relief which might be necessary. On April 14, 1964, a stay of the federal district court order was granted pending appeal to the Supreme Court of the United States.

### III

For many reasons, we believe that we should decide the issues presented and provide necessary remedies for achieving valid reapportionment. In the presence of the demonstrated willingness of the Legislature[6] to act and the willingness of our courts to assume jurisdiction, the federal district court should be relieved of responsibility in this matter for a period sufficient to allow such remedies to become effective. In assuming the responsibility of securing, in a timely fashion, a reapportionment plan which would meet the requirements of the Federal and State Constitutions, we have taken literally the words of the Supreme Court of the United States: *"We applaud the willingness of state courts to assume jurisdiction and render decision in cases involving challenges to state legislative apportionment schemes."* *Maryland Committee for Fair Representation v. Tawes,* 377 U.S. 656, 674, 84 S. Ct. 1442, 1451-52 (1964). (Emphasis supplied.)

This suit challenges the recent Pennsylvania Reapportionment Acts and the election of state senators and representatives thereunder. More importantly, it challenges—in light of recent decisions interpreting the Constitution of the United States—the validity of certain provisions of the Constitution of Pennsylvania which establish the legislative branch of government. It presents one of the most important constitutional questions ever raised in the history of this Commonwealth. It involves the basic rights of the citizens of Pennsylvania in the election of their state lawmakers. Historically and logically, this Court is the most appropriate forum to determine the issues presented and

---

[6] See note 7, *infra.*

to fashion suitable remedies. Proper and continuing respect for federal-state judicial relationship necessitates consideration by the Supreme Court of Pennsylvania of the relevant state statutes and state constitutional provisions, subject, of course, to review by the Supreme Court of the United States.

Furthermore, jurisdiction with respect to the matters involved was obtained by the Court of Common Pleas of Dauphin County prior to the federal district court, and both the former court and this Court have acted diligently in light of all the circumstances of this case. After the initial complaints were filed in March, 1962, the common pleas court postponed adjudication of the issues involved in order to give the Legislature an opportunity to act at its forthcoming session. At a special session in 1963, the General Assembly enacted reapportionment legislation, and, immediately thereafter, this Court assumed jurisdiction of this case, received findings of fact and a report based on hearing before the Dauphin County court, and promptly heard argument. Meanwhile, the federal district court denied an application for a preliminary injunction which would have restrained state officials from conducting any election for state legislative office, pending final enactment by the General Assembly of reapportionment legislation then being considered.[7]

---

[7] This case must be contrasted with *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 716 n.3, 84 S. Ct. 1472, 1476 n.3 (1964), where the Supreme Court of the United States quoted, with approval, the position of the federal district court, which refused to abstain: " 'The considerations which demand abstinence are not present in the instant case. Here, the General Assembly of the State of Colorado has repeatedly refused to perform the mandate imposed by the Colorado Constitution to apportion the legislature. The likelihood that the unapportioned General Assembly will ever apportion itself now appears remote. The Supreme Court of Colorado, while retaining jurisdiction of the subject matter of the controversy presented to it, has postponed further consideration of the cause until June, 1963. Under

446

Therefore, both the federal court and the state courts postponed judicial action while awaiting the final passage of the Pennsylvania Reapportionment Acts; both acted promptly in their respective cases in the spring of 1964.[8] Further immediate action by us was made unnecessary by the stay of the federal order, granted April 14, 1964, pending appeal to the Supreme Court of the United States. Thus, we were given the opportunity to await opinions of that Court in related cases concerning reapportionment in other states before rendering a decision in the instant case.

It is obvious, of course, that the federal district court's decision of April 9, 1964, was made without the benefit of this Court's interpretation of relevant Pennsylvania constitutional provisions, and, more importantly, without the benefit of recent crucial and controlling decisions announced by the Supreme Court of the United States on June 15, 1964.[9] We believe, for reasons which will appear later in our opinion, that reliance on all that was said and directed in the opinion of the district court, although excellent in many respects, would be constitutionally unsafe.

The General Assembly of Pennsylvania is entitled to an opportunity to enact reapportionment legislation pursuant to the recent *Reynolds* cases and to our interpretation here of pertinent provisions of the

---

these circumstances, we must conclude that the parties do not, at least at present, have an adequate, speedy and complete remedy apart from that asserted in the case at bar and thus grounds for abstention are at this time lacking.' "

[8] As already indicated, this Court heard arguments on April 7, 1964. The federal district court filed its findings, opinion and order two days later.

[9] *Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct. 1362 (1964); *WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 84 S. Ct. 1418 (1964); *Maryland Committee for Fair Representation v. Tawes*, 377 U.S. 656, 84 S. Ct. 1442 (1964); *Davis v. Mann*, 377 U.S. 678, 84 S. Ct. 1453 (1964); *Roman v. Sincock*, 377 U.S. 695, 84 S. Ct. 1462 (1964); *Lucas v.*

Pennsylvania Constitution. Since the Legislature is intimately acquainted with the characteristics of Pennsylvania and is primarily responsible for constitutional apportionment, action by that body, taken promptly and in good faith, is more likely to achieve a workable, constitutionally acceptable result than an apportionment following the suggested plan of the district court.

## IV

The Supreme Court of the United States has held that "seats in both houses of a bicameral state legislature must be apportioned on a population basis"[10] that "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State";[11] that "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race . . . or economic status";[12] and that state legislative districting schemes which give the same number of representatives to unequal numbers of constituents would not be constitutionally sustainable.[13]

The Act of January 9, 1964, No. 1, which fixes the number of representatives at 209 divides the state into districts as follows:

(Population ratio based on division by 200: 56,597)

---

*Forty-Fourth General Assembly of Colorado*, 377 U.S. 712, 84 S. Ct. 1472 (1964). These cases shall hereinafter be referred to as the *"Reynolds* cases." The cases deal with the following states, respectively, Alabama, New York, Maryland, Virginia, Delaware and Colorado.

[10] *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S. Ct. 1362, 1385 (1964).

[11] Ibid.

[12] Id. at 566, 84 S. Ct. at 1384.

[13] Id. at 563, 84 S. Ct. at 1382.

| County | District No. | District Total | No. of Representatives | Population per Representative |
|---|---|---|---|---|
| Philadelphia | 1 | 57,507 | 1 | 57,507 |
| | 2 | 123,445 | 2 | 61,722 |
| | 3 | 50,896 | 1 | 50,896 |
| | 4 | 52,246 | 1 | 52,246 |
| | 5 | 118,067 | 2 | 59,033 |
| | 6 | 59,203 | 1 | 59,203 |
| | 7 | 105,037 | 2 | 52,519 |
| | 8 | 66,017 | 1 | 66,017 |
| | 9 | 68,833 | 1 | 68,833 |
| | 10 | 53,550 | 1 | 53,550 |
| | 11 | 59,483 | 1 | 59,483 |
| | 12 | 166,944 | 3 | 55,648 |
| | 13 | 54,497 | 1 | 54,497 |
| | 14 | 50,616 | 1 | 50,616 |
| | 15 | 53,563 | 1 | 53,563 |
| | 16 | 51,055 | 1 | 51,055 |
| | 17 | 98,589 | 2 | 49,299 |
| | 18 | 65,622 | 1 | 65,622 |
| | 19 | 64,956 | 1 | 64,956 |
| | 20 | 53,986 | 1 | 53,986 |
| | 21 | 114,280 | 2 | 57,140 |
| | 22 | 42,761 | 1 | 42,761 |
| | 23 | 64,982 | 1 | 64,982 |
| | 24 | 48,898 | 1 | 48,898 |
| | 25 | 137,260 | 2 | 68,630 |
| | 26 | 120,210 | 2 | 60,105 |
| Adams | | 51,906 | 1 | 51,906 |
| Allegheny | 1 | 137,544 | 2 | 68,772 |
| | 2 | 50,690 | 1 | 50,690 |
| | 3 | 49,644 | 1 | 49,644 |
| | 4 | 49,413 | 1 | 49,413 |
| | 5 | 47,301 | 1 | 47,301 |
| | 6 | 132,115 | 2 | 66,058 |
| | 7 | 143,605 | 2 | 71,802 |
| | 8 | 53,515 | 1 | 53,515 |
| | 9 | 111,365 | 2 | 55,682 |

| County | District No. | District Total | No. of Repre- sentatives | Population per Repre- sentative |
|---|---|---|---|---|
| Allegheny (Cont'd) | | | | |
| | 10 | 63,944 | 1 | 63,944 |
| | 11 | 127,373 | 2 | 63,687 |
| | 12 | 62,839 | 1 | 62,839 |
| | 13 | 60,727 | 1 | 60,727 |
| | 14 | 235,672 | 4 | 58,918 |
| | 15 | 153,108 | 3 | 51,036 |
| | 16 | 150,966 | 3 | 50,322 |
| Armstrong | | 79,524 | 1 | 79,524 |
| Beaver | 1 | 102,521 | 2 | 51,260 |
| | 2 | 104,427 | 2 | 52,213 |
| Bedford | | 42,451 | 1 | 42,451 |
| Berks | 1 | 48,551 | 1 | 48,551 |
| | 2 | 59,639 | 1 | 59,639 |
| | 3 | 56,817 | 1 | 56,817 |
| | 4 | 60,781 | 1 | 60,781 |
| | 5 | 49,626 | 1 | 49,626 |
| Blair | 1 | 69,407 | 1 | 69,407 |
| | 2 | 67,863 | 1 | 67,863 |
| Bradford | | 54,925 | 1 | 54,925 |
| Bucks | 1 | 236,905 | 4 | 59,226 |
| | 2 | 71,662 | 1 | 71,662 |
| Butler | 1 | 58,819 | 1 | 58,819 |
| | 2 | 55,820 | 1 | 55,820 |
| Cambria | 1 | 56,756 | 1 | 56,756 |
| | 2 | 95,114 | 2 | 47,557 |
| | 3 | 51,413 | 1 | 51,413 |
| Cameron | | 7,586 | 1 | 7,586 |
| Carbon | | 52,889 | 1 | 52,889 |
| Centre | | 78,580 | 1 | 78,580 |
| Chester | 1 | 105,824 | 2 | 52,912 |
| | 2 | 104,784 | 2 | 52,392 |
| Clarion | | 37,408 | 1 | 37,408 |
| Clearfield | | 81,534 | 1 | 81,534 |
| Clinton | | 37,619 | 1 | 37,619 |
| Columbia | | 53,489 | 1 | 53,489 |

| County | District No. | District Total | No. of Representatives | Population per Representative |
|---|---|---|---|---|
| Crawford | | 77,956 | 1 | 77,956 |
| Cumberland | 1 | 62,193 | 1 | 62,193 |
| | 2 | 62,623 | 1 | 62,623 |
| Dauphin | 1 | 79,697 | 1 | 79,697 |
| | 2 | 140,558 | 3 | 46,853 |
| Delaware | 1 | 63,658 | 1 | 63,658 |
| | 2 | 255,556 | 4 | 63,889 |
| | 3 | 233,940 | 4 | 58,485 |
| Elk | | 37,328 | 1 | 37,328 |
| Erie | 1 | 69,946 | 1 | 69,946 |
| | 2 | 68,494 | 1 | 68,494 |
| | 3 | 112,242 | 2 | 56,121 |
| Fayette | 1 | 56,971 | 1 | 56,971 |
| | 2 | 112,369 | 2 | 56,184 |
| Forest | | 4,485 | 1 | 4,485 |
| Franklin | 1 | 44,617 | 1 | 44,617 |
| | 2 | 43,555 | 1 | 43,555 |
| Fulton | | 10,597 | 1 | 10,597 |
| Greene | | 39,424 | 1 | 39,424 |
| Huntingdon | | 39,457 | 1 | 39,457 |
| Indiana | | 75,366 | 1 | 75,366 |
| Jefferson | | 46,792 | 1 | 46,792 |
| Juniata | | 15,874 | 1 | 15,874 |
| Lackawanna | 1 | 55,074 | 1 | 55,074 |
| | 2 | 56,369 | 1 | 56,369 |
| | 3 | 67,164 | 1 | 67,164 |
| | 4 | 55,924 | 1 | 55,924 |
| Lancaster | 1 | 61,055 | 1 | 61,055 |
| | 2 | 217,304 | 4 | 54,326 |
| Lawrence | 1 | 53,353 | 1 | 53,353 |
| | 2 | 59,612 | 1 | 59,612 |
| Lebanon | | 90,853 | 2 | 45,427 |
| Lehigh | 1 | 108,347 | 2 | 54,173 |
| | 2 | 119,189 | 2 | 59,594 |
| Luzerne | 1 | 55,300 | 1 | 55,300 |
| | 2 | 56,124 | 1 | 56,124 |

| County | District No. | District Total | No. of Representatives | Population per Representative |
|---|---|---|---|---|
| Luzerne (Cont'd) | | | | |
| | 3 | 55,926 | 1 | 55,926 |
| | 4 | 58,929 | 1 | 58,929 |
| | 5 | 57,142 | 1 | 57,142 |
| | 6 | 63,551 | 1 | 63,551 |
| Lycoming | 1 | 51,014 | 1 | 51,014 |
| | 2 | 58,353 | 1 | 58,353 |
| Mercer | 1 | 61,209 | 1 | 61,209 |
| | 2 | 66,310 | 1 | 66,310 |
| McKean | | 54,517 | 1 | 54,517 |
| Mifflin | | 44,348 | 1 | 44,348 |
| Monroe | | 39,567 | 1 | 39,567 |
| Montgomery | 1 | 99,444 | 2 | 49,722 |
| | 2 | 128,234 | 2 | 64,117 |
| | 3 | 134,560 | 2 | 67,280 |
| | 4 | 154,444 | 3 | 51,481 |
| Montour | | 16,730 | 1 | 16,730 |
| Northampton | 1 | 55,325 | 1 | 55,325 |
| | 2 | 52,438 | 1 | 52,438 |
| | 3 | 93,649 | 2 | 46,824 |
| Northumberland | 1 | 50,422 | 1 | 50,422 |
| | 2 | 53,716 | 1 | 53,716 |
| Perry | | 26,582 | 1 | 26,582 |
| Pike | | 9,158 | 1 | 9,158 |
| Potter | | 16,483 | 1 | 16,483 |
| Schuylkill | 1 | 64,196 | 1 | 64,196 |
| | 2 | 108,831 | 2 | 54,416 |
| Snyder | | 25,922 | 1 | 25,922 |
| Somerset | | 77,450 | 1 | 77,450 |
| Sullivan | | 6,251 | 1 | 6,251 |
| Susquehanna | | 33,137 | 1 | 33,137 |
| Tioga | | 36,614 | 1 | 36,614 |
| Union | | 25,646 | 1 | 25,646 |
| Venango | | 65,295 | 1 | 65,295 |
| Warren | | 45,582 | 1 | 45,582 |

| County | District No. | District Total | No. of Representatives | Population per Representative |
|---|---|---|---|---|
| Washington | 1 | 108,030 | 2 | 54,015 |
| | 2 | 109,241 | 2 | 54,620 |
| Wayne | | 28,237 | 1 | 28,237 |
| Westmoreland | 1 | 64,337 | 1 | 64,337 |
| | 2 | 58,224 | 1 | 58,224 |
| | 3 | 60,717 | 1 | 60,717 |
| | 4 | 57,659 | 1 | 57,659 |
| | 5 | 49,827 | 1 | 49,827 |
| | 6 | 61,865 | 1 | 61,865 |
| Wyoming | | 16,813 | 1 | 16,813 |
| York | 1 | 54,504 | 1 | 54,504 |
| | 2 | 64,744 | 1 | 64,744 |
| | 3 | 57,176 | 1 | 57,176 |
| | 4 | 61,882 | 1 | 61,882 |

An examination of the foregoing apportionment of representatives indicates quite clearly that in numerous instances the same number of representatives is alloted to unequal numbers of constituents. We realize, as does the Supreme Court of the United States, "that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters," and that "mathematical exactness or precision is hardly a workable constitutional requirement."[14] But the present districting scheme does not meet that requirement of the Fourteenth Amendment which "demands no less than substantially equal state legislative representation for all citizens, of all places . . . ."[15]

Several vivid examples, by no means exhaustive, illustrate the gross disparities which exist under the Act. Twelve counties, namely Clearfield, with a population of 81,534; Armstrong, with a population of 79,-524; Centre, with a population of 78,580; Crawford,

---

[14] Id. at 577, 84 S. Ct. at 1390.
[15] Id. at 568, 84 S. Ct. at 1385.

with a population of 77,956; Somerset, with a population of 77,450; Indiana, with a population of 75,366; Venango, with a population of 65,295; Bradford, with a population of 54,925; McKean, with a population of 54,517; Columbia, with a population of 53,489; Carbon, with a population of 52,889; and Adams, with a population of 51,906, are assigned only one representative each. Twelve other counties, namely, Forest, with a population of 4,485; Sullivan, with a population of 6,251; Cameron, with a population of 7,586; Pike, with a population of 9,158; Fulton, with a population of 10,597; Juniata, with a population of 15,874; Potter, with a population of 16,483; Montour, with a population of 16,730; Wyoming, with a population of 16,813; Snyder, with a population of 25,922; Union, with a population of 25,646; and Perry, with a population of 26,582, are also assigned one representative each. Furthermore, thirteen other counties, ranging in populations from a low of 28,237, to a high of 46,792, are also assigned one representative each.[16] These examples show, by cursory analysis, the existence of at least thirty-seven districts which differ widely in population but are equal in representation.

In examining the districts established by the Act, it is apparent that many population disparities resulted from an allocation by the Legislature of at least one representative to each county in the state regardless of the population of that county. This allocation resulted from the assumption that the heretofore unquestioned pattern of one representative per county was mandated by the Pennsylvania Constitution, Article II, §17. Although the Supreme Court of the United States has recognized that "a consideration that appears to be of more substance in justifying some devia-

---

[16] Jefferson, 46,792; Warren, 45,582; Mifflin, 44,348; Bedford, 42,451; Monroe, 39,567; Huntingdon, 39,457; Greene, 39,424; Clinton, 37,619; Clarion, 37,408; Elk, 37,328; Tioga, 36,614; Susquehanna, 33,137; and Wayne, 28,237.

tions from population-based representation in state legislatures is that of insuring some voice to political subdivisions . . .,"[17] that Court has made it clear that "permitting deviations from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population."[18]  The Supreme Court of the United States has stated: "Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body.  This would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties. ... [I]f, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." *Reynolds v. Sims,* 377 U.S. 533, 581, 84 S. Ct. 1362, 1391-92 (1964).

Careful consideration of the legislative districting scheme embodied in the Pennsylvania Reapportionment Act, No. 1, as well as the populations of all of Pennsylvania's counties, compels us to rule that assignment of one seat to each county, regardless of population, results in the submergence of population as the controlling consideration in apportionment and is offensive to the Fourteenth Amendment to the Constitution of the United States.  It must therefore be concluded

---

[17] *Reynolds v. Sims,* 377 U.S. 533, 580, 581, 84 S. Ct. 1362, 1391 (1964).

[18] Ibid.

that the Act of January 9, 1964, No. 1 (which provides
for reapportionment of the House of Representatives),
by substantially diluting the right to vote of individu-
als in some districts when compared with the rights of
voters in other districts, is constitutionally insuffi-
cient.

## V

As we have indicated, the Supreme Court of the
United States has held that reapportionment of both
houses in a bicameral legislature must be based on
population. The Act of January 9, 1964, No. 2, ap-
portions the State Senate into senatorial districts, as
follows:

(Population ratio per Senator : 226,387)

| District No. | County | 1960 Population | No. of Senators |
|---|---|---|---|
| 1 | Philadelphia (part) | 260,767 | 1 |
| 2 | Philadelphia (part) | 255,869 | 1 |
| 3 | Philadelphia (part) | 251,415 | 1 |
| 4 | Philadelphia (part) | 241,032 | 1 |
| 5 | Philadelphia (part) | 236;148 | 1 |
| 6 | Philadelphia (part) | 242,667 | 1 |
| 7 | Philadelphia (part) | 266,242 | 1 |
| 8 | Philadelphia (part) | 248,372 | 1 |
| 37 | Allegheny (part) | 236,359 | 1 |
| 38 | Allegheny (part) | 233,003 | 1 |
| 40 | Allegheny (part) | 241,633 | 1 |
| 42 | Allegheny (part) | 226,269 | 1 |
| 43 | Allegheny (part) | 237,367 | 1 |
| 44 | Allegheny (part) | 233,086 | 1 |
| 45 | Allegheny (part) | 222,104 | 1 |
| 9 | Delaware (part) | 255,888 | 1 |
| 26 | Delaware (part) | 297,266 | 1 |
| 12 | Montgomery (part) | 262,794 | 1 |
| 17 | Montgomery (part) | 253,888 | 1 |
| 39 | Westmoreland | 352,629 | 1 |
| 20 | Luzerne | 346,972 | 1 |
| 10 | Bucks | 308,567 | 1 |

| District No. | County | 1960 Population | No. of Senators |
|---|---|---|---|
| 13 | Lancaster | 278,359 | 1 |
| 11 | Berks | 275,414 | 1 |
| 29 | Schuylkill, Lebanon | 263,880 | 1 |
| 49 | Erie | 250,682 | 1 |
| 28 | York | 238,336 | 1 |
| 22 | Lackawanna | 234,531 | 1 |
| 21 | Butler, Lawrence | 227,604 | 1 |
| 16 | Lehigh | 227,536 | 1 |
| 15 | Dauphin | 220,255 | 1 |
| 46 | Washington | 217,271 | 1 |
| 31 | Mifflin, Juniata, Perry, Cumberland | 211,620 | 1 |
| 19 | Chester | 210,608 | 1 |
| 32 | Fayette, Greene | 208,764 | 1 |
| 47 | Beaver | 206,948 | 1 |
| 50 | Mercer, Crawford | 205,475 | 1 |
| 35 | Cambria | 203,283 | 1 |
| 41 | Jefferson, Armstrong, Indiana | 201,682 | 1 |
| 18 | Northampton | 201,412 | 1 |
| 24 | Columbia, Lycoming, Montour | 179,586 | 1 |
| 30 | Blair, Huntingdon | 176,727 | 1 |
| 25 | Potter, McKean, Warren, Clinton, Cameron | 161,787 | 1 |
| 34 | Centre, Clearfield | 160,114 | 1 |
| 27 | Northumberland, Snyder, Union | 155,706 | 1 |
| 23 | Bradford, Susquehanna, Tioga, Wyoming, Sullivan | 147,740 | 1 |
| 48 | Elk, Forest, Clarion, Venango | 144,516 | 1 |
| 33 | Franklin, Adams | 140,078 | 1 |
| 36 | Bedford, Fulton, Somerset | 130,498 | 1 |
| 14 | Carbon, Monroe, Pike, Wayne | 129,851 | 1 |

Examination of the foregoing senatorial districts shows that, in many instances, they contain widely varying numbers of people. Some examples of gross disparities in population can be cited. The tenth district consisting of Bucks, with a population of 308,-567; the twentieth district consisting of Luzerne, with a population of 346,972; the thirty-ninth district consisting of Westmoreland, with a population of 352,629, are each represented by one senator. The fourteenth district consisting of Carbon, Monroe, Pike, and Wayne, with a population of 129,851; the thirty-sixth district consisting of Bedford, Fulton, and Somerset, with a population of 130,498; the thirty-third district consisting of Franklin and Adams, with a population of 140,078; the forty-eighth district consisting of Elk, Forest, Clarion, and Venango, with a population of 144,516; the twenty-third district consisting of Bradford, Susquehanna, Tioga, Wyoming, and Sullivan, with a population of 147,740, are each represented by one senator. In the examples just cited, senators from the tenth, twentieth, and thirty-ninth districts each represent more than two times as many people as do senators from each of the other districts.

In *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S. Ct. 1362, 1382 (1964), the Supreme Court of the United States said: "if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote . . . in the disfavored areas had not been effectively diluted."

Careful consideration of the entire legislative districting scheme for the Pennsylvania Senate, including not only the districts which we have cited above, but other districts as well, requires us to conclude that the Act of January 9, 1964, No. 2, which provides for reapportionment of the Senate by substantially diluting the right to vote of individuals in some dis-

tricts when compared with the rights of voters in other districts, fails to meet the requirements of the Fourteenth Amendment to the Constitution of the United States.

## VI

In light of our conclusion that the Acts of January 9, 1964, Nos. 1 and 2, are constitutionally insufficient, we have given much consideration to the remedy which should be granted. Recent decisions of the Supreme Court of the United States make it clear that it is for us to determine "whether the imminence of the 1964 . . . general elections requires the utilization of the apportionment scheme contained" in those acts notwithstanding their invalidity, as the following excerpts indicate:

"Since primary responsibility for legislative apportionment rests with the legislature itself, and since adequate time exists in which the Maryland General Assembly can act, the Maryland courts need feel obliged to take further affirmative action *only if the legislature fails to enact* a constitutionally valid state legislative apportionment scheme in a timely fashion *after being afforded a further opportunity by the courts to do so.* However, under no circumstances should the 1966 election of members of the Maryland Legislature be permitted to be conducted pursuant to the existing or any other unconstitutional plan. We therefore reverse the judgment of the Maryland Court of Appeals, and remand the case to that Court for further proceedings not inconsistent with the views stated here and in our opinion in Reynolds v. Sims." *Maryland Committee for Fair Representation v. Tawes*, 377 U.S. 656, 676, 84 S. Ct. 1442, 1452-53 (1964). (Emphasis supplied.)

"Since all members of both houses of the New York Legislature will be elected in November 1964, the court below, acting under equitable principles, must now determine whether, because of the imminence of that

election and in order to give the New York Legislature an opportunity to fashion a constitutionally valid legislative apportionment plan, it would be desirable to permit the 1964 election of legislators to be conducted pursuant to the existing provisions, or whether under the circumstances the effectuation of appellants' right to a properly weighted voice in the election of state legislators should not be delayed beyond the 1964 election." *WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 655, 84 S. Ct. 1418, 1429 (1964).

"Since the apportionment of seats in the Colorado Legislature . . . fails to comport with the requirements of the Equal Protection Clause, the decision below must be reversed. Beyond what we said in our opinion in Reynolds, we express no view on questions relating to remedies at the present time. On remand, the District Court must now determine whether the imminence of the 1964 primary and general elections requires that utilization of the apportionment scheme contained in the constitutional amendment be permitted, for purposes of those elections, or whether the circumstances in Colorado are such that appellants' right to cast adequately weighted votes for members of the State Legislature can practicably be effectuated in 1964." *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 739, 84 S. Ct. 1472, 1487-88 (1964).

It is obvious that the Pennsylvania Legislature cannot properly act to reapportion itself in the short time remaining before the election of November 3, 1964, and months after the April 28, 1964 primary election. We do believe, however, that the Legislature made an earnest effort to reapportion itself in 1963. Unfortunately, it was then without the benefit of the views of the Supreme Court of the United States expressed in the *Reynolds* cases and without an interpretation by this Court of important and relevant provisions of the Pennsylvania Constitution. Serious disruption of or-

derly state election processes and basic governmental functions would result from immediate action by any judicial tribunal restraining or interfering with the normal operation of the election machinery at this late date. The Legislature should not be denied a reasonable opportunity to enact new reapportionment legislation. We therefore hold that the 1964 election of Pennsylvania legislators should and must be conducted pursuant to the Acts of January 9, 1964, Nos. 1 and 2.[19] Under no circumstances, however, may the

---

[19] These acts represent considerable improvement over previous legislation. The hearing judge, in his findings of fact, said: "The last apportionment of the Senate prior to the 1963 Apportionment Act aforesaid was under the Act of May 10, 1921, P. L. 449, as amended by Act of April 26, 1923, P. L. 106 (25 P.S. 2201). Under said 1921-1923 Acts, Philadelphia was divided into eight senatorial districts, which under 1921 [sic] population statistics ranged in percentage of district population to total Philadelphia population from a low of 7.1% (3rd. district) to a high of 15.6% (8th district). This imbalance of district percentages to total Philadelphia population figures became successively more marked with each decennial census. Under 1960 census figures, the range is from a low of 2.5% (3rd district) to a high of 26.1% (8th district)."

Under the 1964 Act, this imbalance of district percentages in Philadelphia has been largely corrected. (The ratio per senator is 226,387—11,319,366 divided by 50.) For example, the third district with one senator now has a population of 251,415, while the eighth district has a population of 248,372. Several other examples of districts in which imbalances were corrected are: District No. 38, which had a population of 134,345 per senator, now has a population of 233,003 per senator; District No. 40, which had a population of 328,712, now has a population of 241,633 per senator; District No. 42, which had a population of 109,140, now has a population of 226,269 per senator; District No. 43, which had a population of 157,955, now has a population of 237,367 per senator; District No. 44, which had a population of 338,549, now has a population of 233,086; District No. 45, which had a population of 509,886, now has a population of 222,104.

In the House of Representatives, where the ratio per representative is 54,150 (11,319,366 divided among 209 members) or 56,597 (if the population is divided by 200), many population disparities were lessened. Several examples can be cited: District

1966 election of members of the Pennsylvania Legislature be conducted pursuant to a constitutionally invalid plan.

The task of reapportionment is not only the responsibility of the Legislature, it is also a function which can be best accomplished by that elected branch of government. The composition of the Legislature, the knowledge which its members from every part of the state bring to its deliberations, its techniques for gathering information, and other factors inherent in the legislative process, make it the most appropriate body for the drawing of lines dividing the state into senatorial and representative districts. We expect, therefore, that the General Assembly will enact reapportionment legislation in accordance with constitutional requirements.

## VII

In order to prevent undue confusion on the part of those who are assigned the primary task of reapportionment, we feel compelled to discuss several provisions of the Constitution of Pennsylvania as well as

---

No. 2 in Allegheny County, which had a population of 29,883 per representative, now has a population of 50,690 per representative; District No. 3 in Allegheny County, which had a population of 38,804, now has a population of 49,644 per representative; District No. 15 in Allegheny County, which had a population of 75,506, now has a population of 51,036 per representative; District No. 16 in Allegheny County, which had a population of 74,465, now has a population of 50,322 per representative; Beaver County District No. 1, which had a population of 76,152, now has a population of 51,261; District No. 2 in Bucks County, which had a population of 139,293, now has a population of 71,662; District No. 26 in Philadelphia County, which had a population of 36,459, now has a population of 60,105; District No. 1 in Chester County, which had a population of 49,034, now has a population of 52,912; while District No. 2 in Chester County, which had a population of 80,787, now has a population of 52,392; and District No. 3 in Delaware County, which had a population of 90,026, now has a population of 58,485.

to comment upon certain aspects of the opinion filed by the district court.

Article II, §16, of the Pennsylvania Constitution, which relates to senatorial districts, provides: "The State shall be divided into fifty senatorial districts of compact and contiguous territory as nearly equal in population as may be, and each district shall be entitled to elect one Senator. Each county containing one or more ratios of population shall be entitled to one Senator for each ratio, and to an additional Senator for a surplus population exceeding three-fifths of a ratio, but no county shall form a separate district unless it shall contain four-fifths of a ratio, except where the adjoining counties are each entitled to one or more Senators, when such county may be assigned a Senator on less than four-fifths and exceeding one-half of a ratio; and no county shall be divided unless entitled to two or more Senators. No city or county shall be entitled to separate representation exceeding one-sixth of the whole number of Senators. No ward, borough, or township shall be divided in the formation of a district. The senatorial ratio shall be ascertained by dividing the whole population of the State by the number fifty."

The first sentence of §16 embraces fully the population principle expressed by the Supreme Court of the United States in the *Reynolds* cases. The Constitution's intention to make population the starting point and controlling criterion in senatorial districting is manifest and mandatory. It acknowledges what the Supreme Court of the United States has also acknowledged, "that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters,"[20] by providing that the senatorial districts "should be as near-

---

[20] *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S. Ct. 1362, 1390 (1964).

ly equal in population as may be." But this phrase cannot and must not be construed to permit substantial dilution of the right to vote. It is our view that §16, when construed as a whole, demands that Senate apportionment legislation respect county lines and lines of other political subdivisions (such as wards, boroughs, and townships), insofar as possible, without doing violence to the population principle enunciated by the first sentence of §16 and also by the Fourteenth Amendment to the Federal Constitution. The Supreme Court of the United States has said: "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering. . . . Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds v. Sims,* 377 U.S. 533, 579, 84 S. Ct. 1362, 1390 (1964).

We hold, therefore, that Article II, §16 of the Pennsylvania Constitution requires that senatorial reapportionment legislation must maintain the integrity of counties and other political subdivisions, insofar as possible, and must provide for compact districts of contiguous territory, subject always to the overriding objective and mandate that such districts shall be "as nearly equal in population as may be." We must emphasize that, if necessary, any political subdivision or subdivisions may be divided or combined in the formation of districts where the population principle cannot otherwise be satisfied. Furthermore, the number of

464

senators per political subdivision may not be limited if such limitation violates the equal-population principle.

Article II, §17, of the Pennsylvania Constitution, which relates to the House of Representatives, provides: "The members of the House of Representatives shall be apportioned among the several counties, on a ratio obtained by dividing the population of the State as ascertained by the most recent United States census by two hundred. Every county containing less than five ratios shall have one representative for every full ratio, and an additional representative when the surplus exceeds half a ratio; but each county shall have at least one representative. Every county containing five ratios or more shall have one representative for every full ratio. Every city containing a population equal to a ratio shall elect separately its proportion of the representatives allotted to the county in which it is located. Every city entitled to more than four representatives, and every county having over one hundred thousand inhabitants shall be divided into districts of compact and contiguous territory, each district to elect its proportion of representatives according to its population, but no district shall elect more than four representatives."

It is clear that the first sentence of §17 is in accord with the requirements of the federal constitution. It expressly recognizes the equal-population principle as the controlling factor in apportioning the House of Representatives. Division of the population of the state by two hundred, supplies "a ratio" and a starting point in the construction of districts. In contrast to §16 which provides for a fixed number, i.e., "fifty senatorial districts" with each district "entitled to elect one Senator," nothing in §17 precludes the establishment of a House of Representatives consisting of more than two hundred members, provided, of course, the equal-population rule is observed.

The requirement that apportionment should be among the several counties further signifies an intention to respect county lines and to utilize counties as units of representation to the maximum extent consistent with the equal-population principle. Indeed, §17, when considered as a whole, demands that the boundaries of all political subdivisions be respected when not in conflict with the overriding population principle. It must be interpreted to require that counties with small populations, if necessary, be joined with other counties for the purpose of electing and sharing a representative. We hold that no provision of §17 prohibits the division or combination of counties in the formation of districts where the population principle cannot otherwise be satisfied.

## VIII

Although the opinion of the district court sought to anticipate some of the requirements laid down by recent decisions of the Supreme Court of the United States, we feel that it differs in some material respects from the views contained in those controlling decisions. Throughout the district court's opinion runs the theme that if there is equality of representation as between rural groups of counties on the one hand and urban groups of counties on the other, then Pennsylvania will be apportioned constitutionally.[21] With this theme we cannot agree. Unconstitutional discrimination may exist irrespective of the rural or urban character of the underrepresented or overrepresented district. Those whose task it is to reapportion the Pennsylvania Legislature must approach their assignment with the understanding that they are to create districts which are as nearly equal in population as is practicable.

"By holding that as a federal constitutional requisite both houses of a state legislature must be appor-

---

[21] This, of course, is not so, since inequalities may exist between urban or rural districts themselves.

tioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S. Ct. 1362, 1389-90 (1964).

Furthermore, the district court announced that it would not invalidate unequal representation resulting from use of the county as a district, provided that the disparity from the norm does not exceed one-half of a ratio. In our view, the establishment of a rigid mathematical standard is inappropriate in evaluating the constitutional validity of a state legislative apportionment scheme. In *Roman v. Sincock,* 377 U.S. 695, 710 n.21, 84 S. Ct. 1462, 1470 n.21 (1964), the Supreme Court pointed out that the lower court in that case had suggested that population-based variance ratios smaller than $1\frac{1}{2}$ to 1 would presumably comport with minimal constitutional requisites, while ratios in excess thereof would necessarily involve deviations from population-based apportionment too extreme to be constitutionally sustainable. The Court said: "Our affirmance of the decision below is not meant to indicate approval of the District Court's attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population. In our view the problem does not lend itself to any such uniform formula, and *it is neither practicable nor desirable to establish rigid mathematical standards* for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, *the proper judicial approach is to ascertain whether,* under the particular circumstances existing in the individual State whose legislative apportionment is at issue, *there has been a faithful adherence to a plan of population-based representation,* with such minor deviations only as may occur in recog-

nizing certain factors that are free from any taint of arbitrariness or discrimination." (Emphasis supplied.)

Finally, the opinion of the district court declared that there is a discrimination in voting power when voters may, by reason of the arrangement of legislative districts, vote for two, or three, or even four representatives, while others are restricted to voting for one only. Language which appears in the opinion of Chief Justice WARREN in *Reynolds,* and other cases, indicates that the presence of some multi-member districts in one legislative house is not per se unconstitutional: "One body could be composed of single-member districts while the other could have at least some multimember districts." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S. Ct. 1362, 1389 (1964).

"Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember or floterial districts." Id. at 579, 84 S. Ct. at 1390.

"We do not intimate that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective." *Lucas v. Forty-Fourth General Assembly of Colorado,* 377 U.S. 713, 731 n.21, 84 S. Ct. 1472, 1483 n.21 (1964).

While we do not believe that the creation of multimember districts of itself, would violate the Federal Constitution simply because the voters in a particular district (where justified by population) would vote for two or more representatives while those in another district would vote for a lesser number, we do believe that a legislative scheme which creates single-member districts and multi-member districts in an arbitrary manner would be objectionable. We would agree with the district court, however, that in the absence of any reasonable justification (historical or otherwise), such districting might be the result of gerrymandering for partisan advantage and, in that event, would be arbitrary and capricious. In light of the constitutional

pitfalls inherent in such a districting scheme, it would be more prudent to approach the matter of apportionment by setting up single-member districts unless valid and compelling reasons exist which require the creation of some multi-member districts.

Our interpretation of the relevant provisions of the Pennsylvania Constitution makes mandatory only such requirements as are in harmony with the Fourteenth Amendment to the Constitution of the United States. We hope the difficult and complex task of the Legislature will be clarified by the guidelines set out in this opinion as well as by the *Reynolds* cases.

We have indicated that it is our expectation that the Legislature will proceed in timely fashion to enact reapportionment laws which conform to constitutional requirements. We must recognize, however, that if the General Assembly fails to act in a timely fashion, we shall be obliged to take necessary affirmative action to insure that the 1966 election of Pennsylvania legislators will be conducted pursuant to a constitutionally valid plan. Proper regard for our responsibility compels us to retain jurisdiction of this matter pending legislative action.[22]

Should the Legislature fail to enact a constitutionally valid plan of reapportionment as soon as practical, but not later than September 1, 1965, we shall take such action as may be appropriate in light of the then existing situation.

Jurisdiction retained in accordance with this opinion.

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I join in the very able Opinion which Justice ROBERTS has written for the Court. However, I am im-

---

[22] Since a new scheme of legislative districting for the entire state, including Bucks County, must be devised in accordance with the principles we have outlined, it is unnecessary for us to reach the specific issues raised by the intervenors.

pelled to express additional views in the faint hope that one or more Justices of the Supreme Court of the United States may thereby be induced to change or modify their viewpoint on the subject of Reapportionment.

I shall first discuss the question of Constitutionality and then the point which I believe the Supreme Court of the United States has overlooked—namely, the deprivation and dilution of the voice, the vote and the representation of minority groups as a result of that Court's recent reapportionment decisions.

The new concept of reapportionment and the justiciability by Courts of questions of congressional and legislative redistricting, commenced with *Baker v. Carr,* 369 U.S. 186, which held that State apportionment and reapportionment presented a justiciable question. The limited effect of *Baker v. Carr* was pointed out by Chief Justice WARREN in *Reynolds v. Sims,* 377 U.S. 533, 556: "In Baker . . . We intimated no view as to the proper constitutional standards for evaluating the validity of a state legislative apportionment scheme."

The appealing slogan which is now so often relied upon, namely, "One person, one vote", was first enunciated in *Gray v. Sanders,* 372 U.S. 368, 381, and reiterated in *Reynolds v. Sims,* supra, page 558. This slogan is susceptible of so many different meanings that it is in reality meaningless. Every person who is qualified to vote is entitled, of course, to one vote and one vote only; but in scores of different matters, in business, in public affairs, in Government, in Senatorial and in Presidential elections and in practical life, the result is often not based or decided solely on arithmetic, and the vote of one person is sometimes more important and weightier than the votes of many or of all those opposed. No contention of "dilution" can alter these practicalities of life.

In *Reynolds v. Sims* and in the five accompanying decisions of the Supreme Court of the United States

construing the Equal Protection Clause of the 14th Amendment* to the Constitution of the United States, the Court clarified and expanded what it meant by "one person, one vote". It held, inter alia, that in a bicameral Legislature *each* House must be apportioned or districted (1) *substantially in accordance with population;* and (2) (a) without invidious apportionment, or (b) dilution of the vote of citizens living in one part of the State or in one district or political unit of the State, as compared with others.

Furthermore, *Reynolds v. Sims,* supra; and *Maryland Committee v. Tawes,* 377 U.S. 656, 84 S. Ct. 1442; and *Gray v. Sanders,* 372 U.S. 368, 381; and *WMCA, Inc. v. Lomenzo,* 377 U.S. 633, 84 S. Ct. 1418; decided, *in effect,* that it was Unconstitutional for the people of a State or for a State Legislature to allot one Representative or one Senator to *each* of the Counties or political divisions in that State, *even though additional* Representatives or Senators were allotted to the more populous Counties or political divisions. The Court also rejected any analogy to the Electoral College or to the Congress of the United States—in the latter, the Constitution allots (as everyone knows) *two Senators* to each State and at least *one Representative* to each State *regardless of population.* It is with a heavy heart, therefore, that I am compelled, by the recent decisions of the Supreme Court of the United States, to hold that certain parts of Section 16 and Section 17 of Article II of the (nearly) century old Constitution of Pennsylvania are Unconstitutional. Under the form and kind of Government established by our Constitution, Pennsylvania has grown prosperous and great, and our people, with rare exceptions, have been satisfied, happy and proud to have such a Republican form of Government.

---

* and incidentally the race and color provisions of the 15th Amendment.

It can be accurately said that no decision of the Supreme Court of the United States in the last hundred years has ever disturbed, dismayed and confused Congressmen, Legislators, Governors, Judges, lawyers and ordinary citizens as has the novel and revolutionary decision in the *Reynolds* group of cases. The form and scheme of Government of the United States which at various times has been the admiration of the civilized world, was created and based upon the foundation rock of three separate, independent, yet intertwined, coordinate co-equal branches of Government, with its inherent fundamental concept of checks and balances. Under the Constitution of the United States (1) The Executive branch administers our Government and "takes care that the laws be faithfully executed". (2) The Legislative branch, including the Congress (and the Legislature of each State) are *solely* vested with *the legislative power,* namely, the power to enact laws and legislation. (3) The third branch, namely, the Courts, are vested with the power and duty to *interpret* the Constitution and the laws—not to execute or enact or revise the laws or the Constitution, beneficial as that would sometimes be. This, our revered system of Government,* with its basic fundamentals of checks and balances, has been radically changed by the recent decisions of the Supreme Court which, under the guise of interpretation (and in the belief that their actions and decisions are in the best interest of our Country), have amended and rewritten the Constitution of the United States and invalidated the Constitutions of most of the States of the Union.

The Supreme Court has, in effect, declared Unconstitutional and invalidated and outlawed the present allocation of Congressmen, Representatives, and State Senators in nearly every State in the Union—espe-

---

* Contrary to superficial thinkers and commentators and slogan-creators, our Country, under Article IV, Section 4, of the United States Constitution, has a "Republican [not democratic] Form of Government", with a democratic way of life.

472

cially those States which have a bicameral government, or base their allocations of Congressmen, Representatives and State Senators on a County or similar political unit basis. Under no provision of the Constitution of the United States nor of the Constitution of Pennsylvania is the Supreme Court of the United States a super Congress or a super Legislature, nor is it given the right or power *to amend or rewrite the Constitution of the United States or the Constitution of Pennsylvania.* That right and power is, without the slightest doubt, reserved to the people of the United States, or to Congress, or to the States. Notwithstanding a little lip service as to the right of a State Legislature to divide a State into different districts for the Senate and the House and also for different terms—provided there is no invidious or unfair districting and no dilution of votes—the Court completely disregards and discards history, tradition, geography, local interests and local problems, differences in dialects and language, in customs, in ideas and ideals in each State and also in many parts of each State. In lieu and in derogation thereof, the Court requires Congressmen and Representatives and State Senators to be districted and selected solely on an arithmetical population basis, i.e., substantially equal in each political district or political division.

One of the tragic results which we believe has been overlooked by that Court's majority is that this newly devised form of representative Government will almost inevitably deprive minority groups of a fair and effective representation in legislative halls of their principles, customs, traditions, their particular problems and desired solutions, and the preservation of their cherished way of life. Their interests will not only be diluted, they will be in practical effect, frequently completely ignored.

This is so far removed and so different from what the people in each State of the United States have be-

lieved in and cherished and on which they have for a century or more based their Government and their way of life, that in the words of Justice HARLAN this brand new interpretation of the Equal Protection Clause finds no support and no home in the Constitution of the United States* and is "incredible".

Surely, the unjust and unjustifiable legislative apportionments, as well as the political gerrymandering in certain States or in certain political divisions of a State, can be declared Unconstitutional and prohibited without this wholesale destruction of the age-old just and cherished form of Government which has prevailed in nearly every State in the Union. With due respect, isn't the Court's cure worse than the disease?

My views and my fears are not imaginary. They are supported by public expressions in Congress, in State Legislatures, in the press and news media throughout our Country, and most importantly, by Justices of the Supreme Court of the United States. For example:

In *Baker v. Carr*, 369 U.S. 186, 267, Justice FRANK- FUTER in his dissenting Opinion characterized the Court's decision (on the subject of reapportionment) as ". . . a massive repudiation of the experience of our whole past in asserting destructively novel judicial power . . ."

In *Reynolds v. Sims*, 377 U.S., supra, Justice HAR- LAN, in his dissenting Opinion, said (pages 607, 614- 615, 625) : "It is *incredible*** that Congress would have exacted ratification of the Fourteenth Amendment as

---

* If the Supreme Court (majority) were logical, would they not have to hold that nearly every law passed and nearly every appropriation made in the last hundred years by an unconstitutionally created and unconstitutionally elected Congress and by an unconstitutionally created and elected State Legislature, are Unconstitutional and void? And how in logic can an Unconstitutional Congress or an Unconstitutional State Legislature statutorily provide for valid and Constitutional elections?

** Italics throughout, ours.

the price of readmission, would have studied the State Constitutions for compliance with the Amendment, and would then have disregarded violations of it.

". . . today's decisions are refuted by the language of the Amendment which they construe and by the inference fairly to be drawn from subsequently enacted Amendments. They are unequivocally refuted by history and by consistent theory and practice from the time of the adoption of the Fourteenth Amendment until today.

". . . The consequence of today's decision is that in all but the handful of States which may already satisfy the new requirements the local District Court or, it may be, the state courts, are given blanket authority and the constitutional duty to supervise apportionment of the State Legislatures. It is difficult to imagine a more intolerable and inappropriate interference by the judiciary with the independent legislatures of the States.

". . . For when, in the name of constitutional interpretation, the Court *adds* something to the Constitution [*] that was deliberately excluded from it, the Court in reality substitutes its view of what should be so for the amending process."

In *Lucas v. Colorado General Assembly,* 377 U.S. 713, 84 S. Ct. 1472 and *WMCA, Inc. v. Lomenzo,* supra, Justice STEWART, joined by Justice CLARK, termed the majority reapportionment decision "woefully wrong" and further said (pages 1429-1431) : "To put the matter plainly, there is nothing in all the history of this Court's decisions which supports this constitutional rule. The Court's draconian pronouncement, which makes unconstitutional the legislatures of most of the 50 States, *finds no support in the words of the Constitution, in any prior decision of this Court, or in*

---

* We may add "or subtracts something from the Constitution."

*the 175-year political history of our Federal Union.*
With all respect, I am convinced these decisions mark
a long step backward into that unhappy era when a
majority of the members of this Court were thought
by many to have convinced themselves and each other
that the demands of the Constitution were to be meas-
ured not by what it says, but by their own notions of
wise political theory. The rule announced today is at
odds with long-established principles of constitutional
adjudication under the Equal Protection Clause, and
it stifles values of local individuality and initiative
vital to the character of the Federal Union which it
was the genius of our Constitution to create.

". . . Instead, the Court says that the requirements
of the Equal Protection Clause can be met in any
State only by the uncritical, simplistic, and heavy-
handed application of sixth-grade arithmetic."

In *Wesberry v. Sanders,* 376 U.S. 1, Justice HAR-
LAN, dissenting, said (pages 20-22, 42, 48) : "I had not
expected to witness the day when the Supreme Court
of the United States would render a decision which
casts grave doubt on the constitutionality of the com-
position of the House of Representatives. It is not an
exaggeration to say that such is the effect of today's
decision. The Court's holding that the Constitution
requires States to select Representatives either by elec-
tions at large or by elections in districts composed 'as
nearly as is practicable' of equal population places in
jeopardy the seats of almost all the members of the
present House of Representatives.

". . . Thus, today's decision impugns the validity
of the election of 398 Representatives from 37 States,
leaving a 'constitutional' House of 37 members now
sitting.

"Only a demonstration which could not be avoided
would justify this Court in rendering a decision the
effect of which, inescapably as I see it, is to declare
constitutionally defective the very composition of a co-

ordinate branch of the Federal Government. The Court's opinion not only fails to make such a demonstration. It is unsound logically on its face and demonstrably unsound historically.

". . . *The constitutional right which the Court creates is manufactured out of whole cloth.*

". . . The claim for judicial relief in this case strikes at one of the fundamental doctrines of our system of government, the separation of powers. In upholding that claim, *the Court attempts to effect reforms in a field which the Constitution, as plainly as can be, has committed exclusively to the political process.*

"This Court, no less than all other branches of the Government, is bound by the Constitution . . . . The stability of this institution ultimately depends not only upon its being alert to keep the other branches of government within constitutional bounds but equally upon recognition of the limitations on the Court's own functions in the constitutional system."

Cf. also, Justice BLACK's dissenting Opinion in *Jackson v. Denno,* 378 U.S. 368, 12 L. Ed. 2d 908, where he said (page 934) : "I think that the New York law here held invalid is in full accord with all the guarantees of the federal Constitution and that it should not be held invalid by this Court *because of a belief that the Court can improve on the Constitution.*"

See also, Justice CLARK's dissenting Opinion in *Fay v. Noia,* 372 U.S. 391, where he said (page 445) : ". . . But the Court today in releasing Noia *makes an 'abrupt break' not only with the Constitution and the statute but also with its past decisions,* disrupting the delicate balance of federalism so foremost in the minds of the Founding Fathers and so uniquely important in the field of law enforcement."

Justice FRANKFURTER, in his Concurring Opinion in *Green v. United States,* 356 U.S. 165, 193 (1958), said (page 193) :

"The admonition of Mr. Justice BRANDEIS that we are not a third branch of the Legislature should never be disregarded."

Justice JACKSON prophetically foresaw what has now actually happened in the Supreme Court when, in a Concurring Opinion in *Brown v. Allen*, 344 U.S. 443 (1953), he said (page 535):

"Whatever has been intended, this Court also has generated an impression in much of the judiciary that regard for precedents and authorities is obsolete, that words no longer mean what they have always meant to the profession, that the law knows no fixed principles."

Compare also, Justice STEWART's dissenting Opinion in *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, where he said (page 988) that the majority decision was "Supported by no stronger authority than its own rhetoric"; and that "the Court perverts those precious constitutional guarantees."

To summarize: Section 16 and Section 17 of Article II of the Constitution of Pennsylvania and the Act of January 9, 1964, No. 1, P. L. (1963) 1419, 25 PS §2221 (Supp. 1963), are Unconstitutional. The creation of Senatorial and Legislative Districts* is a matter for the Legislature and not for the Courts. The number, composition and experience of the Legislature in this field is far greater than that of the Courts, which are not only devoid of "apportionment powers" but have far fewer facilities and far less resources and are far less qualified than a Legislature.

I would require the Legislature of Pennsylvania to enact a Constitutionally valid plan of reapportionment as soon as practical, but not later than September 1, 1965. The new Reapportionment Act should provide substantially as follows: "The State shall be divided

---

* and Congressional Districts, under Article I, Section 4, of the Constitution of the United States, and by virtue of authority from Congress.

into fifty senatorial districts of compact and contiguous territory as nearly equal in population as is practicable and each district shall be entitled to elect one Senator, who shall serve for a period of four years. No County or political subdivision shall be divided in the formation of a district unless the practicalities compel such division.

"The House of Representatives shall be elected for a period of two years. For purposes of representation in the House of Representatives, the State shall be divided into legislative districts of compact and contiguous territory and the number of representatives in each district shall be determined on as nearly as is practicable an equal ratio of population basis. Except when entitled to more than one representative, no County shall be divided in the formation of a district unless the practicalities compel such division."

The foregoing requirements are necessarily subject to any change or modification or clarification of the views or mandates of the Supreme Court of the United States. In the meantime, this Court should retain jurisdiction of the subject matter of apportionment and reapportionment.*

---

\* As Chief Justice WARREN said in *Maryland Committee v. Tawes*, 377 U.S., supra, at page 674: "We applaud the willingness of state courts to assume jurisdiction and render decision in cases involving challenges to state legislative apportionment schemes. However, in determining the validity of a State's apportionment plan, the same federal constitutional standards are applicable whether the matter is litigated in a federal or a state court."