Commonwealth ex rel. Specter, Appellant,
*v.* Levin.

Argued February 2, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Arlen Specter,* District Attorney, in propria persona, with him *Martin H. Belsky,* Assistant District Attorney, for appellant.

*Louis W. Fryman,* with him *William Austin Meehan, Steven J. Hartz, Larry S. Keiser,* and *Becker, Fryman & Ervais,* for appellants.

*Lawrence Sager,* in propria persona, with him *Sager & Sager,* for appellant.

*George T. Kelton,* with him *Begley, Carlin, Mandio, Kelton & Popkin,* for appellants.

*Louis C. Johanson,* for appellants.

*K. L. Shirk, Jr.,* with him *Shirk, Reist and Buckwalter,* for appellants.

*John J. McCreesh, Jr.,* with him *McCreesh & McCreesh,* for appellants.

*Robert W. Valimont,* for appellants.

*Sheldon W. Farber,* for appellants.

*John H. Broujos,* for appellants.

*Thomas R. Ceraso,* for appellants.

*John R. Luke,* for appellant.

*Bennett G. Picker,* with him *W. Bourne Ruthrauff,* for appellant.

*James V. Senape, Jr.,* submitted a brief for appellants.

*John Philip Diefenderfer,* with him *Stuckert, Yates & Krewson,* for appellants.

*William E. Mowatt,* with him *Joseph T. Doyle,* for appellants.

*John Fuller,* with him *Bruce L. Smith, Charles J. Swick, Carroll F. Purdy,* and *Metzger, Hafer, Keefer, Thomas & Wood,* for appellants.

*J. Shane Creamer,* Attorney General, with him *Walter L. Foulke,* Executive Deputy Attorney General, for appellees.

*Thomas N. O'Neill, Jr.,* with him *Montgomery, McCracken, Walker & Rhoads,* for appellees.

ORDER PER CURIAM:
AND NOW, this seventh day of February, 1972, upon consideration of the above appeals, we find that the Final Reapportionment Plan of the Pennsylvania

State Legislative Reapportionment Commission filed on December 29, 1971, is in compliance with the mandates of the Federal and Pennsylvania Constitutions and therefore shall have the force of law. Hence it is ordered that said Plan filed on December 29, 1971, shall be used in the forthcoming Primary and General Elections of 1972 and thereafter shall remain in force and effect until constitutionally altered.

Mr. Chief Justice JONES, Mr. Justice POMEROY and Mr. Justice MANDERINO dissent.

Opinions to follow.

———

OPINION BY MR. JUSTICE ROBERTS, June 5, 1972:

On February 7, 1972, after oral argument on 17 of the 18 above-captioned appeals,[1] this Court entered an order declaring that the final plan for the reapportionment of the Pennsylvania Senate and House of Representatives filed by the Pennsylvania Legislative Reapportionment Commission was in compliance with the requirements of the United States Constitution and the Constitution of this Commonwealth.[2] In that order we indicated that opinions would follow. This opinion is in response to that order.

## I

The reapportionment plan that is attacked by appellants is the first work product of the Pennsylvania Legislative Reapportionment Commission established by an amendment to the Pennsylvania Constitution in 1968.[3] Prior to 1968 reapportionment of the Pennsyl-

———

[1] No. 70 May Term, 1972, was submitted to this Court without oral argument.

[2] Mr. Chief Justice JONES, Mr. Justice POMEROY, and Mr. Justice MANDERINO dissented from our February 7, 1972, order.

[3] Constitution of Pennsylvania, Art. II, Section 17.

vania Legislature was effected by act of the General Assembly.[4]

The Legislative Reapportionment Commission consists of five members. Four of the members are the majority and minority leaders of both the Senate and the House of Representatives, or deputies appointed by each of them.[5] The fifth member is the chairman of the Commission.[6] The chairman is selected either by the four other members of the Commission, or, if those four members fail to select a chairman within the time prescribed, the chairman is selected by this Court.[7] The Commission acts by a majority vote of its membership.[8]

The advantages of assigning the responsibility for reapportioning the Legislature to such a commission are quite obvious, and several other states have recently adopted or considered proposals for similar commissions.[9] The equal representation on the Commission provided to the majority and minority members of each house precludes the reapportionment process from being unfairly dominated by the party in power at the moment of apportionment. In addition, the provision for a chairman who can act as a "tie-breaker" eliminates the possibility of a legislative deadlock on reapportionment such as the one that occurred in the Legis-

---

[4] See *Butcher v. Bloom*, 415 Pa. 438, 442, 203 A. 2d 556, 558 (1964) [hereinafter referred to as *Butcher I*].

[5] Constitution of Pennsylvania, Art. II, Section 17(b).

[6] Id.

[7] Id. The present chairman of the Reapportionment Commission was appointed by this Court.

[8] Id. Section 17(a).

[9] See Dixon, The Warren Court Crusade for the Holy Grail of "One Man-One Vote," 1969 The Supreme Court Review 219, 246-47 [hereinafter cited as Dixon, Crusade]; Dixon & Hatheway, The Seminal Issue in State Constitutional Revision: Reapportionment Method and Standards, 10 Wm. & Mary L. Rev. 888, 890 (1969) [hereinafter cited as Dixon & Hatheway].

lature of this Commonwealth in 1965 and compelled this Court to undertake the task of reapportionment.[10] At the same time the Legislature's expertise in reapportionment matters is essentially retained.[11]

## II

In its epic decision on state legislative apportionment in *Reynolds v. Sims,* 377 U.S. 533, 84 S. Ct. 1362 (1964), the United States Supreme Court held: "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable."[12] The Court went on to approve "divergences from a strict population standard [that] are based on legitimate considerations incident to the effectuation of a rational state policy,"[13] but cautioned that these divergences *must not dilute* the equal-population principle "in any significant way."[14] The Court held: "*[T]he overriding objective must be substantial equality of population among the various districts. . . .*"[15]

Section 16 of Article II of the Pennsylvania Constitution, in addition to incorporating the "as-nearly-of-equal-population-as-is-practicable" mandate of *Reynolds,* establishes two other factors which a plan for reapportionment of the Pennsylvania Legislature is to meet. That section provides: "The Commonwealth shall be di-

---

[10] See *Butcher v. Bloom,* 420 Pa. 305, 307-09, 216 A. 2d 457, 457-59 (1966) [hereinafter referred to as *Butcher II*].

[11] *Butcher I,* 415 Pa. at 461, 203 A. 2d at 569.

[12] 377 U.S. at 577, 84 S. Ct. at 1390.

[13] Id. at 579, 84 S. Ct. at 1391; see *Swann v. Adams,* 385 U.S. 440, 444, 87 S. Ct. 569, 572 (1967); *Roman v. Sincock,* 377 U.S. 695, 710, 84 S. Ct. 1449, 1458 (1964).

[14] 377 U.S. at 578, 84 S. Ct. at 1390.

[15] Id. at 579, 84 S. Ct. at 1390 (emphasis added).

vided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. . . . Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district."[16] In *Reynolds*, Section 16's additional objectives for reapportionment plans were specifically recognized as legitimate considerations which can justify some divergences from a strict population standard. The Court held: "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims."[17]

However, in light of the fact that the Equal Protection Clause requires that in any reapportionment scheme "the overriding objectives must be substantial equality of population,"[18] it is not constitutionally permissible to totally achieve Section 16's objective of respecting the boundaries of political subdivisions. As the Supreme Court explained in *Reynolds*: "[P]ermitting deviations from population-based representation

---

[16] Prior to the 1968 amendment which added the present Section 16 of Article II to the Pennsylvania Constitution, Sections 16 and 17 of Article II dealt with Senatorial and Representative districts. Both Senate and House districts were required to be of "compact and contiguous territory," but the requirement that political subdivisions be respected was specifically set forth only for Senatorial districts. With respect to Senatorial districts it was provided: "No ward, borough, or township shall be divided in the formation of a district."

[17] 377 U.S. at 578, 84 S. Ct. at 1390; see *Abate v. Mundt*, 403 U.S. 182, 185, 91 S. Ct. 1904, 1906 (1971); *Swann v. Adams*, 385 U.S. 440, 444, 87 S. Ct. 569, 572 (1967).

[18] See text at note 15, supra.

does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population. Carried too far, a scheme of giving at least one seat in one house to each political subdivision . . . could easily result, in many States, in a total subversion of the equal-population principle in that legislative body. . . . [I]f, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired."[19]

In addition, Section 16's desire for districts that are "compact" must also yield, if need be, to the "overriding objective . . . [of] substantial equality of population."[20] Moreover, attempts to maintain the integrity of the boundaries of political subdivisions unless it is "absolutely necessary" to do otherwise will in reality make it impossible to achieve districts of precise mathematical compactness.[21] A great many, if not most of the counties, cities, towns, boroughs, townships and wards in this Commonwealth have a geographical shape which falls far short of ideal mathematical compactness.[22]

---

[19] 377 U.S. at 581, 84 S. Ct. at 1391-92 (footnote omitted). See *Sims v. Amos*, 336 F. Supp. 924, 938-39 (M.D. Ala. 1972).

[20] 377 U.S. at 579, 84 S. Ct. at 1390.

[21] Reock, Measuring Compactness as a Requirement of Legislative Apportionment, 5 Midwest Journal of Political Science 70, 74 (1961).

[22] For the views of two commentators who have advanced mathematical methods of measuring geographical compactness, see Schwartzberg, Reapportionment, Gerrymanders, and the Notion of "Compactness," 50 Minn. L. Rev. 443 (1966), and Reock, Measuring Compactness as a Requirement of Legislative Apportionment, 5 Midwest Journal of Political Science 70 (1961).

Thus the approach that this Court adopted when we were obliged to undertake the task of reapportionment in 1966 remains the approach which the Legislative Apportionment Commission must employ in formulating its plan. In *Butcher II*, 420 Pa. at 309-10, 216 A. 2d at 459 (1966), we stated: "Our primary concern has been to provide for substantial equality of population among legislative districts. At the same time, we have sought to maintain the integrity of political subdivisions and to create compact districts of contiguous territory, insofar as these goals could be realized under the circumstances of the population distribution of this Commonwealth."[23]

Subsequent to this Court's decision in *Butcher II* the United States Supreme Court decided *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S. Ct. 1225 (1969), and *Wells v. Rockefeller*, 394 U.S. 542, 89 S. Ct. 1234 (1969). In these cases, which involved Congressional redistricting plans for the states of Missouri and New York, the Court held: "[T]he command of Art. I, §2, that States create congressional districts which provide equal representation for equal numbers of people permits only the limited population variances which are

---

[23] In *Butcher I*, 415 Pa. at 463, 203 A. 2d at 570-71, this Court first set forth the approach which we subsequently employed in *Butcher II*. We held: "Article II, §16 of the Pennsylvania Constitution requires that senatorial reapportionment legislation must maintain the integrity of counties and other political subdivisions, insofar as possible, and must provide for compact districts of contiguous territory, subject always to the overriding objective and mandate that such districts shall be 'as nearly equal in population as may be.' We must emphasize that, if necessary, any political subdivision or subdivisions may be divided or combined in the formation of districts where the population principle cannot otherwise be satisfied."

The approach which this Court adopted by its disposition of *Butcher I* was implicitly approved by the United States Supreme Court. See *Scranton v. Drew*, 379 U.S. 40, 85 S. Ct. 207 (1964).

unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown."[24]

In *Kirkpatrick* the Court struck down a Missouri redistricting plan in which the total range of deviation from the ideal district population was 5.97%.[25] The Court not only observed that it was "not seriously contended that the Missouri Legislature came as close to equality as it might have come,"[26] but stated in addition: "[I]t is simply inconceivable that population disparities of the magnitude found in the Missouri plan were unavoidable."[27] The Court also held: "[W]e do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing . . . political subdivision boundaries."[28]

*Kirkpatrick* and *Wells,* as has already been noted, were decisions involving Congressional redistricting plans. These decisions indicate that deviations from equality of population that were formerly regarded as insubstantial and permissible will now be regarded as substantial and impermissible, necessitating a closer adherence to equality of population, even in the area of state legislative apportionment.[29] However, *Kirkpatrick's* rejection, in Congressional redistricting, of the

---

[24] *Kirkpatrick v. Preisler,* 394 U.S. 526, 531, 89 S. Ct. 1225, 1229 (1969) ; see *Wells v. Rockefeller,* 394 U.S. 542, 546, 89 S. Ct. 1234, 1237 (1969).

[25] 394 U.S. at 528-29, 89 S. Ct. at 1227-28.

[26] Id. at 531, 89 S. Ct. at 1229.

[27] Id. at 532, 89 S. Ct. at 1229.

[28] Id. at 533-34, 89 S. Ct. at 1230.

[29] With *Kirkpatrick* and *Wells* compare *Swann v. Adams,* 385 U.S. 440, 87 S. Ct. 569 (1967) (held unconstitutional a plan for the reapportionment of the Florida Legislature where the total range of deviation from the ideal district population was 25.65% in the Senate and 33.55% in the House). See Dixon, Crusade at 219.

maintenance of the boundaries of political subdivisions as a justification for deviations from absolute population equality, cannot be applied in full force to state legislative reapportionment.[30]

As early as *Reynolds v. Sims* the Supreme Court recognized that "[s]omewhat more flexibility may . . . be constitutionally permissible with respect to state legislative apportionment than in congressional districting."[31] The Court there made it clear why states should have "somewhat" greater flexibility to attempt to preserve the boundaries of political subdivisions in legis-

___

[30] The Harvard Law Review's survey of the United States Supreme Court's 1968 Term, 83 Harv. L. Rev. 7, 103 (1969), took the following position: "At any rate, it is unlikely that the Court will rely on Kirkpatrick to support a declaration that the following of political subdivision lines cannot justify population variances in state legislative apportionment. The Court in Reynolds recognized that the role political subdivisions play in carrying out state policy provides a legitimate reason for representation of those subdivisions in state legislatures, though these subdivisions play no corresponding role in federal government."

On April 17, 1972, the United States Supreme Court granted certiorari in the case of *Howell v. Mahan*, 330 F. Supp. 1138 (E.D. Va. 1971), to consider whether "state legislative districts must be as nearly equal in population to the one-man, one vote guidelines for Congressional districts. . . ." New York Times, April 18, 1972, p. 24, col. 3. See 40 L.W. 3497.

It should also be noted that subsequent to the *Kirkpatrick* and *Wells* decisions, in holding constitutional a plan for the apportionment of the board of supervisors of Rockland County, New York, the Supreme Court repeated the holding of *Reynolds* that "a desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality." *Abate v. Mundt*, 403 U.S. 182, 185, 91 S. Ct. 1904, 1907 (1971) (citing *Reynolds v. Sims*, 377 U.S. 533, 578, 84 S. Ct. 1362, 1390 (1964)). See *Whitcomb v. Chavis*, 403 U.S. 124, 162, 91 S. Ct. 1858, 1878-79 (1971) (opinion of Mr. Justice WHITE, in which Chief Justice BURGER, Mr. Justice BLACK, and Mr. Justice BLACKMUN joined) ; see generally, Dixon, Crusade.

[31] 377 U.S. at 578, 84 S. Ct. at 1390.

lative apportionment: "Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions."[32] However, these political subdivisions play no corresponding role in the federal government,[33] and little of Congress' activity involves legislation directed "only to the concerns of particular [state] political subdivisions."

## III

We turn now to an examination of the plan filed by the Reapportionment Commission. Since the "overriding objective" of any plan must be "substantial equality of population among the various districts,"[34] our first inquiry is whether the Commission's plan meets that objective. We believe that it does.

---

[32] 377 U.S. at 580-81, 84 S. Ct. at 1391.

[33] The Supreme Court, 1968 Term, 83 Harv. L. Rev. 7, 103 (1969).

[34] See text at notes 15 and 23, supra.

The Supreme Court's language in *Reynolds* that a state must make "an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable. . . ." (377 U.S. at 577, 84 S. Ct. at 1390) must be read to require "good faith efforts" to achieve districts "as nearly of equal population as is practicable" only in the absence of any "legitimate considerations" authorizing "divergences from a strict population standard." Id. at 579, 84 S. Ct. at 1391. Once some legitimate considerations are recognized, as we have done here, the question is how far from absolute equality can the districting proceed in order to effectuate these legitimate considerations. The answer that the Supreme Court gave in *Reynolds* is that the divergencies cannot submerge the "overriding objective" of "substantial equality of population among the various districts." Id. at 579, 84 S. Ct. at 1390.

Although the United States Supreme Court has eschewed establishing rigid mathematical standards for what is substantial equality of population in state legislative apportionment,[35] it is clear that the requirement of substantial equality has undergone a process of refinement since the *Reynolds* decision in 1964.[36] For example, this Court's apportionment plan in 1966 produced deviations between the highest and lowest-populated districts of 19.16% from the ideal Senate district and 30.04% from the ideal House district.[37]

However, the United States Supreme Court's subsequent decision in *Swann v. Adams,* 385 U.S. 440, 87 S. Ct. 569 (1967), struck down a reapportionment plan for the Florida Legislature which provided for only a 25.65% range of deviation from the ideal population for Senate districts.[38] In addition, as has already been

---

[35] *Roman v. Sincock,* 377 U.S. 695, 710, 84 S. Ct. 1449, 1458 (1964); *Reynolds v. Sims,* 377 U.S. 533, 578, 84 S. Ct. 1362, 1390 (1964).

[36] See *Whitcomb v. Chavis,* 403 U.S. 124, 162, 91 S. Ct. 1858, 1879 (1971) (opinion of Mr. Justice WHITE, in which Chief Justice BURGER, Mr. Justice BLACK, and Mr. Justice BLACKMUN joined); Dixon & Hatheway at 901.

[37] This Court's 1966 legislative reapportionment plan produced the following population deviations:

|  | Senate | House |
|---|---|---|
| Variation Range Above and Below Ideal District Population | - 21,068<br>+ 22,308 | - 7,852<br>+ 8,900 |
| Variation Range Above and Below Ideal District Population - Percentage | - 9.306<br>+ 9.853 | - 14.081<br>+ 15.961 |
| Total Variation Range from Ideal District Population - Percentage | 19.159 | 30.042 |
| Ratio of Lowest District Population to Highest | 1:1.21 | 1:1.34 |

Brief for Appellees, Exhibit A.

[38] In *Kilgarlin v. Hill,* 386 U.S. 120, 87 S. Ct. 820 (1967), decided a few months after *Swann,* the Court invalidated a plan for

noted, the Supreme Court's decision in *Kirkpatrick v. Preisler,* although it involved Congressional redistricting, struck down a plan in which the total range of deviation from the ideal district population was only 5.97%.[39]

It is clear that the Legislative Reapportionment Commission recognized that closer adherence to the requirement of equality of population is now constitutionally in order for state legislative apportionment plans. Under the plan for the reapportionment of the Senate filed by the Commission, the 47th Senatorial District has the lowest population, 231,172, which is 2.02% below the ideal population for Senatorial districts. The 13th Senatorial District has the largest population, 241,360, which is 2.29% above the ideal for Senatorial districts. Thus the total range of deviation from the ideal Senate district population is only 4.31%. Forty of the Senatorial districts deviate less than 1.5% from the ideal, of which 22 deviate less than 1%. The ratio of the lowest Senatorial district population to the highest is 1 to 1.04.[40]

According to the plan for the reapportionment of the House of Representatives filed by the Commission, the 33rd Legislative District has the smallest population, 56,675, which is 2.48% below the ideal population for Legislative districts. The 19th Legislative District has the largest population, 59,845, which is 2.98% above the average. Thus the total range of deviation from the ideal Legislative district population is only 5.46%. One hundred forty-nine Legislative districts deviate less than 1.5% from the ideal, of which 95 de-

the reapportionment of the Texas House of Representatives where the total range of deviation from the ideal district size was only 26.4%.

[39] See text at note 25, supra.

[40] Letter from Legislative Reapportionment Commission, December 29, 1971, set forth in Brief for Appellees, Exhibit B.

viate less than 1%. The ratio of the lowest Legislative district population to the highest is 1 to 1.06.[41]

No decision of the United States Supreme Court or of this Court has ever invalidated a reapportionment plan with population deviations as minimal as those occasioned by the Commission's plan, and we believe that the deviations clearly do not dilute the equal-population principle "in any significant way." We conclude therefore that the Commission's plan fully achieves the constitutionally mandated overriding objective of substantial equality of population.

## IV

We also conclude that the Commission's final plan has properly maintained the integrity of political subdivisions to the extent that it is possible without defeating the overriding principle of substantial equality of population.[42] While it is true that the Commission's plan provides for more political subdivision splits than did this Court's reapportionment plan of 1966,[43] this increase was obviously necessitated by the stricter requirements of population equality that are now in order.[44] Yet despite these stricter population requirements, the number of subdivision splits called for by the Commission's plan is still quite small when compared to the 2,566 municipalities[45] and 9,576 voting precincts[46] in this Commonwealth.

---

[41] Id.

[42] See text at note 15, supra.

[43] Even in this Court's 1966 reapportionment plan we found it necessary to split a ward between the Seventh and Thirty-Sixth Senatorial Districts. *Butcher II* at 346, 351-52.

[44] See note 29 and accompanying text, supra.

[45] 1972 Pennsylvania Statistical Abstract, Table 133 ("municipalities" includes cities, boroughs, and townships).

[46] Survey published by Bureau of Election, Dept. of State, Commonwealth of Pennsylvania (1972).

It should also be noted that under any scheme of reapportionment that aims at substantial equality of population, a certain amount of subdivision fragmentation is inevitable. For example, when a political subdivision such as Luzerne County has a population which is approximately 1.45 times as large as the ideal Senatorial district population, it is inevitable that the county will be split between at least two Senatorial districts. Keeping this factor in mind, it is clear that the Commission's plan substantially maintains the integrity of this state's numerous political subdivisions. Under the Commission's plan, 74.6% of this state's counties are divided among the ideal number of Senate districts, and only 25.4% of the counties are divided into more than the ideal number of Senate districts.[47]

## V

It is undisputed that the Commission's plan provides for districts of "contiguous" territory. A contiguous district has been defined as "one in which a

---

[47] In Pennsylvania there are 54 counties which have populations of less than 235,949, the ideal Senatorial district population, and which ideally should be placed wholly within one Senatorial district. Of those 54, 42 are wholly within one district (77.8%), and 12 are divided between two districts (22.2%).

There are 9 counties which have populations between 235,949 and 471,898 and which ideally should be divided between two districts. Of those 9, 6 are divided between two districts (66.7%), 2 are divided among three districts (22.2%), and one is divided among five districts (11.1%).

There are 2 counties which have populations between 471,898 and 707,847 and which ideally should be divided among three districts. Of those 2, one is divided among four districts (50%), and one is divided among five districts (50%).

There is one county with a population of 1,605,016 and which ideally should be divided among nine districts. It is divided among nine districts. See generally, *Sims v. Amos*, 336 F. Supp. 924, 938 (M.D. Ala. 1972).

person can go from any point within the district to any other point [within the district] without leaving the district,"[48] or one in which "no part of the district is wholly physically separate from any other part."[49] Each and every district drawn by the Commission meets these definitions of contiguity.

Finally, we can discern no basis for disturbing the Commission's plan on the ground that the districts for which it provides are not composed of "compact" territory. Before any apportionment plan can be attacked for lack of compactness it must be recognized that there is a certain degree of unavoidable noncompactness in any apportionment scheme. The population density of this state is quite uneven, and therefore attempts to achieve the overriding objective of substantial equality of population will ordinarily necessitate the drawing of districts that are not models of geometric compactness. In addition, attempts to maintain the integrity of the boundaries of political subdivisions will add another increment of unavoidable noncompactness.[50] Thus, in the words of one commentator: "Dragons, bacon strips, dumbbells, and other strained shapes are not always reliable signs that partisan (or racial or ethnic or factional) interests are being served. . . ."[51]

Because of this unavoidable noncompactness, a determination that a reapportionment plan must fail for lack of compactness cannot be made merely by a glance at an electoral map and a determination that the shape of a particular district is not aesthetically pleasing. Instead, as has been proposed by several commentators,[52]

---

[48] Note, Reapportionment, 79 Harv. L. Rev. 1228, 1284 (1966).

[49] Dixon & Hatheway at 891 n.9.

[50] See note 21 and accompanying text, supra.

[51] Sickels, Dragons, Bacon Strips and Dumbbells—Who's Afraid of Reapportionment?, 75 Yale L. Rev. 1300 (1966).

[52] Schwartzberg, Reapportionment, Gerrymanders, and the Notion of "Compactness," 50 Minn. L. Rev. 443 (1966) ; Reock, Meas-

compactness of Legislative districts must be evaluated objectively and with allowance for the elements of unavoidable noncompactness.

However, none of the appellants in this matter offered any concrete or objective data indicating that the districts established by the Commission's plan lack compactness. The most that appellants offered in attacking the compactness of various districts were dictionary definitions of compactness and conclusory assertions that certain districts were not compact. The Pennsylvania Constitution requires that those who challenge the Commission's plan have the burden of establishing that it is "contrary to law."[53] In light of appellants' failure to produce any objective data indicating that the districts established by the Commission's plan lack compactness, we cannot conclude, merely on the basis of appellants' unsupported assertions, that the Commission's plan fails for lack of compactness. This Court will not adopt the illusory and undiscerning approach of rejecting a plan merely because the geographic shapes of a few districts are not aesthetically pleasing.

## VI

Accordingly, the final plan for the reapportionment of the Pennsylvania Senate and House of Representatives filed by the Pennsylvania Legislative Reapportionment Commission is in compliance with all of the requirements of the United States Constitution and the Constitution of this Commonwealth.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES:

I regretfully find myself in disagreement with the majority of my colleagues who, by order dated Febru-

---

uring Compactness as a Requirement of Legislative Apportionment, 5 Midwest Journal of Political Science 70 (1961).

[53] Constitution of Pennsylvania, Art. II, §17(d).

ary 7, 1972, held that the final Reapportionment Plan of the Pennsylvania State Legislative Reapportionment Commission, filed on December 29, 1971, complied with the mandates of the Federal and Pennsylvania Constitutions.

Article II, Section 16, of the Pennsylvania Constitution provides that: "The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which *shall be composed of compact and contiguous territory as nearly equal in population as practicable.* Each senatorial district shall elect one Senator, and each representative district one Representative. *Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district.*" (Emphasis added)[1]

My study of the plan of the Reapportionment Commission convinces me that, while the plan does meet the standard of population equality mandated by both the Federal and Pennsylvania Constitutions, it clearly violates the standard of compactness and the proscription against the division of counties, boroughs, etc., dictated by the Pennsylvania Constitution.

Article II, Section 16, I repeat, specifically provides that senatorial and representative districts "shall be composed of compact and contiguous territory" and that *"unless absolutely necessary"* no county, city, incorporated town, borough, township or ward shall be *divided* in the formation of senatorial or representative districts. Unlike the Federal Constitution which mandates population equality, the Pennsylvania Constitution demands not only population equality but also compactness, contiguity and the preservation of existing lines of political subdivisions or parts thereof except in

---

[1] This Section, substantially, consolidates and reenacts Sections 16 and 17 of Article II of the Constitution of 1874.

cases of absolute necessity. The obvious purpose behind the Pennsylvania constitutional requirements is to prevent partisan gerrymandering.

Even the most cursory examination of the reapportionment plan in the districts involved in these appeals reveals a complete failure on the part of the Commission to comply with the requirement of compactness. In *Butcher v. Bloom*, 415 Pa. 438, 463, 203 A. 2d 556, 570-71 (1964), this Court said: "We hold, therefore, that . . . the Pennsylvania Constitution requires that . . . reapportionment legislation must maintain the integrity of counties and other political subdivisions, insofar as possible, and *must provide for compact districts* of contiguous territory, subject always to the overriding objective and mandate that such districts shall be 'as nearly equal in population as may be.' We must emphasize that, if necessary, any political subdivision or subdivisions may be divided or combined in the formation of districts where the population principle cannot otherwise be satisfied." (Emphasis added)

Definition of the word "compact" is somewhat difficult. It has been defined as "closely united or packed; closely knit; solid; dense; also lying in a narrow compass or arranged so as to economize space; close" (Webster's New Collegiate Dictionary, p. 167) and as "closely or firmly united or packed . . . firm; solid; dense; . . . also, lying in a narrow compass or arranged so as to economize space. . . ." (Black's Law Dictionary, p. 351 (4th ed., 1951)).

Senatorial and legislative districts, as outlined in the instant reapportionment plan, particularly in Philadelphia, Lancaster, Westmoreland, Chester and Bucks Counties, flagrantly violate the rule of compactness. There is an old Chinese proverb that says: "One picture is worth more than 10,000 words." The reapportionment plan clearly presents a picture more eloquent

than words of a complete disregard by the Commission of the constitutional mandate that the districts be compact in nature. In many instances the districts involved in these appeals "twist and wind their way across the map in an erratic, amorphous fashion in order to include scattered pockets of partisan support or exclude centers of opposition voting strength."[2]

Moreover, the Commission's plan completely ignores the constitutional proscription against the division of counties, boroughs, etc. While the Constitution does permit a division of such political subdivisions, it expressly provides that a division shall not take place *"unless absolutely necessary."* The Commission utterly fails to demonstrate any necessity in any manner in justification of the many divisions of political entities embodied in the plan.[3] The majority decision repudiates the constitutional mandate in this respect. In *Reynolds v. Sims,* 377 U.S. 533, 560-61, 578 (1964), the United States Supreme Court observed that, "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme." Time after time, instance after instance, the Reapportion-

_____

[2] *Cf.,* Reock, Jr., *Measuring Compactness as a Requirement of Legislative Apportionment,* 5 Midwest Journal of Political Science 70 (1961).

[3] By way of illustration, in Southeastern Pennsylvania, in the creation of sixteen (16) senatorial districts, county boundaries are crossed seven (7) times, one district includes portions of three (3) counties, two municipalities are split between two districts and one ward is divided among three (3) districts. Such division is a classic example of that to which the United States Supreme Court referred in *Reynolds v. Sims,* 377 U.S. 533, 578-79 (1964): "Indiscriminate districting, without any regard for political subdivision or natural or historical boundaries, may be little more than an open invitation to partisan gerrymandering."

ment Commission has not only divided counties, boroughs and other municipalities but in some instances divided precincts in the same ward so that persons living in the same precinct on opposite sides of a street would vote for representatives in different legislative and senatorial districts.[4]

In my view, the reapportionment plan as presented on these appeals ignores the dictates of the Pennsylvania Constitution in the formation of senatorial and legislative districts and amounts to constitutionally offensive political and partisan gerrymandering.

DISSENTING OPINION BY MR. JUSTICE POMEROY:

It is clear that the reapportionment plan adopted by the Legislative Reapportionment Commission goes considerably farther than did this Court's plan adopted in *Butcher II*[1] in achieving population equality in the voting districts of the Commonwealth,[2] and thus is a distinct gain in reaching for the ideal of one man, one vote mandated by the Fourteenth Amendment. *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506 (1964). It is equally clear that in so doing the new plan has redrawn district lines in such a way as to cross many more boundaries of political subdivisions than did the 1966

---

[4] *See, Long v. Docking*, 283 F. Supp. 539 (D.C. Kan. 1968); *Moss v. Burkhart*, 207 F. Supp. 885 (W.D. Okla. 1962); *Silver v. Brown*, 46 Cal. Rptr. 308, 313, 405 P. 2d 132, 137 (1965); *Preisler v. Doherty*, 365 Mo. 460, 284 S.W. 2d 427 (1955); *Jackman v. Bodine*, 49 N. J. 406, 410, 231 A. 2d 193, 195 (1967); *In the Matter of Orans*, 15 N. Y. 2d 339, 258 N. Y. Supp. 2d 825, 206 N.E. 2d 854 (1965).

[1] *Butcher v. Bloom*, 420 Pa. 305, 216 A. 2d 457 (1966).

[2] As the opinion of the majority points out, the 1966 plan allowed a deviation from the ideal of population equality of a maximum of 19.1% in Senatorial districts and of 30% in Representative districts, compared to 4.3% and 5.4%, respectively, in the present plan.

plan,[3] and that compactness has in a number of instances "gone with the wind."

## I.

The Court seeks to justify the population disparity in the 1971 plan on the ground that it reaches much closer to the ideal of equality than did the former plan, and that the constitutional requirement, as the Supreme Court of the United States has interpreted it, does not mandate rigid mathematical precision. The majority opinion states that no "population deviations as minimal as those occasioned by the Commission's plan" have been invalidated by the United States Supreme Court, and that these deviations "clearly do not dilute the equal-population principle 'in any significant

---

[3] The "splits" of county and municipal lines in 1966 were 13 for the Senatorial districts and 30 for the House of Representative districts. In 1971, the comparative figures were 36 and 169. The breakdown is shown in the following tabulation:

SENATE

|  | 1971 | 1966 |
|---|---|---|
| County Splits (not including Phila.) ...... | 26 | 12 |
| Municipal Splits ......................... | 3 | — |
| Ward—Precincts .......................... | — | — |
| Philadelphia ............................. | 2 | — |
| Ward Splits .......................... | 5 | 1 |
|  | 36 | 13 |

HOUSE

|  | | |
|---|---|---|
| County Splits (not including Phila.) ....... | 45 | 20 |
| Municipal Splits ......................... | 47 | 10 |
| Ward—Precincts .......................... | 42 | — |
| Philadelphia ............................. | 1 | — |
| Ward Splits .......................... | 34 | — |
|  | 169 | 30 |

way.' " The difficulty, however, is that there is no "de minimis" exception which has been recognized by the United States Supreme Court. To the contrary, that Court has expressly rejected the de minimis argument in a case where the maximum spread from the mathematical ideal was only 6%. *Kirkpatrick v. Preisler*, 394 U.S. 526, 22 L. Ed. 2d 519 (1969). The Court there held that "the State must justify each variance, no matter how small". 394 U.S. at 531. That case, to be sure, involved congressional districting, where the population factor may be even more paramount than in districting for state offices, but there is no indication that the de minimis standard would be acceptable in the latter situation.[4]

It may be that satisfactory explanation for and justification of the comparatively minor population deviations which are contained in the present plan can be made. Unfortunately, however, this can be done only by the Reapportionment Commission which struggled with the problem. Unlike the Court in *Butcher II, supra* (see especially the concurring opinion of Mr. Chief Justice BELL and part I of the concurring and dissenting opinion of Mr. Justice ROBERTS, 420 Pa. at 355 and 366), the Commission did not see fit to explain or justify its report in any way, or to indicate on what grounds it dismissed the exceptions which form the

---

[4] At least two members of the Supreme Court would apply the *Kirkpatrick* rule to state office reapportionment, and forbid "[t]oleration of even small deviations", unless they are "unavoidable despite good faith effort to achieve absolute equality, or for which justification is shown." *Abate v. Mundt*, 403 U.S. 182, 39 L.W. 4663, 4665 (1971) (dissenting opinion of Mr. Justice BRENNAN, joined by Mr. Justice DOUGLAS). For a suggestion of a constitutional amendment which would permit of a de minimis approach, see R. Dixon, Jr., "The Warren Court Crusade for the Holy Grail of 'One Man-One Vote' ", The Supreme Court Review (1969), 219 at 234 et seq.

bases for those appeals. We therefore have before us only the plan itself, which constitutes the entire record in this case. I cannot agree that this "res ipsa loquitur" approach passes constitutional muster today.

## II.

Another principal ground on which the present reapportionment plan is attacked is that it unjustifiably violates the integrity of political subdivisions.

In *Butcher I*[5] we construed Article II, §§16 and 17 of the Pennsylvania Constitution of 1874. The former section dealt with Senatorial districts. The court held that Senate apportionment must "respect county lines and lines of other political subdivisions (such as wards, boroughs, and townships) insofar as possible, without doing violence to the population principle enunciated by the first sentence of §16 and also by the Fourteenth Amendment to the Federal Constitution" as interpreted in *Butcher I, supra*. We also held that §17, relating to House of Representatives apportionment, "demands that the boundaries of all political subdivisions be respected when not in conflict with the overriding population principle." More specifically, we stated that §17 must be interpreted to require that "counties with small populations, if necessary, be joined with other counties for the purpose of electing and sharing a representative", and that the section did not prohibit "the division or combination of counties in the formation of districts where the population principle cannot otherwise be satisfied." 415 Pa. at 465.

Since our decision in the two *Butcher* cases, §§16 and 17 of the 1874 Constitution have been amended and consolidated into Article II, §16 of the Constitution of 1968 to provide that "[u]nless absolutely necessary no

---

[5] *Butcher v. Bloom*, 415 Pa. 438, 463, 203 A. 2d 556 (1964).

county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district." The *"absolutely necessary"* is clearly with reference to the immediately preceding and paramount requirement that the districts "be composed of compact and contiguous territory as nearly equal in population as practicable." Those strong, blunt words give unmistakable emphasis to the principle of preserving the integrity of political subdivisions unless their division cannot be avoided because of the "overriding" population requirement, and the requirement of compactness and contiguity.[6]

Faced with the greatly increased number of splits in the Commission's new plan, the court today makes the blanket statement that "[t]his increase was obviously necessitated by the stricter requirements of population equality that are now in order." This may be a good guess, but to me it is by no means obvious. In the face of constitutional language which prohibits divisions unless "absolutely necessary", there surely must be some showing of necessity, some demonstration that "the population principle cannot otherwise be satisfied." The Commission has vouchsafed nothing, and the Court is reduced to trying to read its mind.[7] It

---

[6] The United States Supreme Court has recently reiterated its view "that the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict [numerical] equality." *Abate v. Mundt, supra,* 403 U.S. 185.

[7] The majority opinion, it will be noted, speaks only in general terms, making no attempt to address itself to the particular exceptions and arguments of the various appellants. Similarly, in the single brief filed by the Commonwealth covering the 18 appeals now before us, no attempt is made to treat all the individual and different fact situations which they involve, or to respond to the detailed arguments of the several appellants. The Commission itself has filed no brief on the merits of the appeals. In this context I see nothing to be gained in this dissenting opinion by considering individually the contentions made by each appellant.

may be acknowledged that some dividing of counties, municipalities and wards and some surrender of compactness is unavoidable, but there is no presumption that each split that was made or each misshapen district that was created falls into this category. That the final plan has "the force of law" (Pennsylvania Constitution art. II, §17) does not "bootstrap" its every feature into a position of automatic constitutional validity, absent a showing of necessity.

There can be no doubt that the Commission's task in reapportionment, striving as it must to heed at once the ideals of population equality, territorial compactness and contiguity, and preservation of municipal boundaries, is formidable and complex; perfection is not possible. In my view, however, this does not relieve it of the obligation to explain and justify the inability to accomplish these simultaneous objectives.

For these reasons I dissented from the orders of this Court entered on February 7, 1972.

Mr. Chief Justice JONES joins in this dissent.

---

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I respectfully dissent. The majority opinion erroneously concludes that the Fourteenth Amendment requires *only a substantial* equality of population in each legislative district. Neither the Fourteenth Amendment nor any cases decided in the United States Supreme Court have ever intimated that *substantial* equality is equality. Yet the majority—in a substantiation of their error—tell us that the United States Supreme Court is now requiring a "closer adherence" to equality. Not so. The Court requires—indeed has required— ". . . a good faith effort to achieve precise mathematical equality. . . ." *Wells v. Rockefeller*, 394 U.S. 542, 22 L. Ed. 2d 535 (1969). ". . . The state must justify each variance, no matter how small. . . ." *Kirkpatrick v.*

*Preisler,* 394 U.S. 526, 22 L. Ed. 2d 519 (1969). The Fourteenth Amendment does not speak of *substantial* equal protection of the laws. It speaks of *equal* protection of the laws. When absolute equality is not achieved, the government must show that the lack of equality was either *unavoidable* or that the lack of equality of treatment of a citizen resulted from *a rational plan or scheme* devised to achieve *legitimate state objectives. Reynolds v. Sims,* 377 U.S. 533, 12 L. Ed. 2d 506 (1964).

The Fourteenth Amendment does not require any different standards for equal protection of the laws in voting and apportionment matters than it does in any other matter.

Lack of absolute equal protection of the laws is often unavoidable. A citizen may well claim a denial of equal protection of the laws because the state capitol is located two hundred miles from his home while the distance from the state capitol to another citizen's home is only two miles. The denial would not, however, be unconstitutional; the state could show that such discrimination is unavoidable. It would not be possible to locate the state capitol an exact distance from the residence of each citizen.

Lack of equal protection of the laws also results when the state's desire to achieve a legitimate state objective in one area of concern which will necessarily result in a denial of equal protection to a citizen in another area. A businessman, whose business establishment (a restaurant) is periodically inspected while his neighbor's business establishment (a shoe store) is not periodically inspected, may claim and establish a prima facie case of denial of equal protection of the laws. This would not be a *constitutional* denial of equal protection; to protect the health of citizens in public eating establishments would be a legitimate state objective.

The overriding legitimate state objective justifies the resulting denial of equal protection even though one business establishment is inspected and another is not.

Once the legitimacy of the state's objective is established, the Fourteenth Amendment requires that the means used to achieve the objective be rational not crazy-quilt. A plan or scheme, requiring inspection of Chinese restaurants only, would violate the Fourteenth Amendment.

The United States Supreme Court cases dealing with apportionment have not changed traditional Fourteenth Amendment guarantees of equal protection. These cases entitle a citizen to equal—not substantially equal—protection of the laws; one man's vote must be equal to anothers. Any inequality must be justified as unavoidable or necessary to rationally implement a legitimate state objective. *Reynolds v. Sims, supra.*

Applying these principles to the reapportionment plan submitted by the Pennsylvania Legislative Reapportionment Commission, the plan violates the Fourteenth Amendment because on its face it denies to each citizen of the Commonwealth equality of the vote. The majority opinion's statistics concerning the population of the various legislative districts plainly show that each citizen's vote in the Commonwealth does not receive equal treatment.

The deviations in population in the various legislative districts can not stand because it has not been shown that the deviations were unavoidable *or* resulted from the implementation of a rational plan in order to achieve legitimate state objectives. The submitted plan can not meet either of the tests under the Fourteenth Amendment to the United States Constitution.

The population differences in the various legislative districts were not unavoidable. Unless unavoidable, legislative districts should not vary in population more

than a single vote and only then if the mathematics of odd and even require it. Unavoidable is a relative term and must be considered at a given moment in time under all of the circumstances. Population variations would be totally avoidable if there were readily available to those engaged in apportionment, information concerning every square foot of the Commonwealth of Pennsylvania and the exact pinpointed geographic residence of every single person in the Commonwealth. It would be *possible* for the Commonwealth to obtain such information but the cost would be prohibitive in 1972. Modern technology may allow us in some future century to instantaneously call up such information. When that time comes, mathematical exactness will become practicable and legislative districts will then have to be apportioned with mathematical exactness. Since such exactness today is not possible without prohibitive expenditures, the law does not require such exactness. The law, in 1972, must, however, require the use of those tools which are, without question, available to any apportioning group. In Pennsylvania there is readily available a map of the Commonwealth showing in detail the geographic outline and location of every single municipality from the largest unit to the smallest. This includes counties, cities, boroughs and towns. In addition to such Commonwealth maps, there is available the report of the Bureau of Census which provides population information about Pennsylvania including the population of each political subdivision from the largest to the smallest. The Reapportionment Commission had both of these tools and submitted them to this Court. These tools, with perhaps the assistance of an adding machine, are certainly the minimum tools that must be fully used in determining what results are practicable in 1972, in achieving equality of voting rights for any citizen under the Fourteenth Amend-

ment. The results that can be achieved by the use of these tools are the minimum results which are demanded before it can be properly said that population variations were *unavoidable*.

The districts for the Pennsylvania Senate range from a low of 231,172 to a high of 241,360. The districts for the Pennsylvania House of Representatives range from a low of 56,675 to a high of 59,845. It is plain that some citizens have been given *almost* the equal protection of the laws but not the equal protection of the laws. This did not happen because such different treatment of different citizens was unavoidable. A study of the Pennsylvania Political Subdivision Map and the United States 1970 Census of Population, Pennsylvania booklet will readily indicate to any observer that a simple shift of certain political subdivisions lying along the dividing line between districts would have provided more equalization between districts.

A shift of a political subdivision from one district to another is mandated if more equal results are to be obtained. The Fourteenth Amendment requires no less. We fully recognize that any shift of a political subdivision from one district to another may cause less equalization in other districts. Of course, a shift of a political subdivision anywhere in the state might result in a chain reaction which, as it ripples throughout the Commonwealth, will unequalize more than it equalizes. Such a shift may, of course, not give more citizens more equal protection of the laws. But a study of the Pennsylvania Map and the Population Figures of the Political Subdivisions indicate that much equalization can take place without causing any such chain reactions. Shifts of political subdivisions affecting only two districts—that from which the political subdivision is being removed and that in which the political subdivision

is being placed—involve no chain reactions across the state. Many such shifts are possible in the plans presented.

Because the population variances in the legislative districts were avoidable using the practical tools that are available without requiring any large expenditures of money by the Commonwealth, the plan submitted violates the Fourteenth Amendment to the Constitution of the United States because it gives different treatment under the law to various citizens of the Commonwealth. The population variances can not be justified as being unavoidable.

Even though population variances in legislative districts were avoidable in light of the practicalities of the situation, the variations may be constitutionally permissible if the variations resulted because of the implementation of a rational state plan in order to achieve legitimate state objectives. *Kirkpatrick v. Preisler, supra.*

The Reapportionment Commission has not presented any rational plan which was used as a means to achieve legitimate state objectives.

We have, of course, been given the legitimate objectives of the Commonwealth of Pennsylvania. The Reapportionment Commission states that it attempted to achieve the objectives which are outlined in the Pennsylvania Constitution. The objectives contained in Article II, Section 16, of the Pennsylvania Constitution are, in addition to establishing districts as nearly equal as is practicable, that the districts be of compact and contiguous territory and that no political subdivision be divided unless absolutely necessary.

These have been stated to be legitimate state objectives. The statement of these objectives, however does not end the inquiry concerning the constitutionality of a reapportionment plan.

These objectives contained in the Pennsylvania Constitution are legitimate objectives under the standards outlined by the United States Supreme Court. That Court has said that a rational state plan may be based on the objective of preserving the integrity of political subdivisions to obtain compact and contiguous territory. *Reynolds v. Sims, supra.*

A mere statement, however, that population variances in the legislative districts resulted from the pursuit of legitimate state constitutional objectives does not make it so unless this Court is presented with a rational state plan whose implementation resulted in population variations. *Swann v. Adams,* 385 U.S. 440, 17 L. Ed. 2d 501 (1967). We have been presented with no such plan and are completely in the dark as to whether the discriminations that occurred in population variations resulted from the implementation of a rational state plan or were crazy-quilt.

It may be that at some time in the future the legitimate state objectives will change. For instance, the requirement of compact and contiguous territory and the preservation of the integrity of political subdivisions, which are not required by the Fourteenth Amendment, may give way to considerations which are nongeographic. It is not inconceivable that a rational state plan some day may look to an objective whereby various age groups throughout the Commonwealth receive representation. A legitimate state objective might be that 18 to 25 year olds or 60 to 70 year olds elect representatives separately from other age groups. This may be a legitimate state objective and if a rational plan or scheme is set up and implemented, no denial of equal protection of the law would result.

The Pennsylvania plan must fail because on its face it denies the equal protection of the laws in view of the population variations. It must fail because the Reap-

portionment Commission has not established that these variations were *unavoidable*. It must also fail because the Commission has not established or given to this Court any rational plan which was used in order to achieve the acknowledged legitimate state objectives.

We note that if a state can establish that certain population variances were unavoidable, the percentage deviations between districts may be acceptable, regardless of what percentage deviations are involved. Population deviations, however, based on the second acceptable reason for such deviations, namely that they resulted from a rational state plan will be closely scrutinized. A state plan which is devised to obtain legitimate state objectives may not be constitutional if the result is a substantial variation in population between the districts. *Reynolds v. Sims, supra.*

The majority seems to fall into the error about which we have been warned by the Supreme Court. The task in reapportionment is not to see how close we can come to equality. The task is to achieve equality. Any departure must be *unavoidable* or *justified*. The justification must be balanced against the percentage deviation. *Kirkpatrick v. Preisler, supra.*

We note that in *Kirkpatrick* the Court considered a 5.97% deviation unconstitutional. This was a mimimum deviation, but nothing was presented to justify even such a minimum deviation. The Pennsylvania plan, as the majority points out, deviates only 4.31% for the senatorial districts and 5.46% for the legislative districts. It is fatal for the same reasons. No justification has been shown for such deviation. The legitimate state objectives have been established but no rational plan for the implementation of these objectives has been presented.

On the other hand the Supreme Court has approved a local reapportionment which involved a variation of

11.9%. *Abate v. Mundt*, 403 U.S. 182, 29 L. Ed. 2d 399 (1971). The percentage deviation was balanced against the rational plan used by the municipality to achieve legitimate municipal objectives. This clearly illustrates that percentages alone are irrelevant. The key inquiry is why was a citizen's vote denied equal weight. If the state objective is important enough, a percentage deviation of ten may be constitutionally valid. If the state or local objective are not important, a deviation of even two percent would not be permissible. *Kirkpatrick v. Preisler, supra.*

We are unable to make any evaluation of Pennsylvania's deviation because we have been given no rational plan or scheme by which the legitimate state objectives were pursued.

The plan also violates the requirements of the Pennsylvania Constitution. The Pennsylvania Constitution, Article II, Section 16, requires that the population in the legislative districts be as nearly equal as is practicable. This equality has not been achieved with the practical tools available to the Commission.

The Pennsylvania Constitution also states as legitimate objectives the compactness and contiguity of territory and the integrity of the political subdivisions. A look at the Pennsylvania map with the population of each political subdivision superimposed will readily show that many districts are not compact although they are all contiguous. The plan submitted has also violated the integrity of many political subdivisions. The Senate plan has violated the integrity of twenty-six counties out of sixty-seven. The plan for the House of Representatives has violated the integrity of forty-five counties out of sixty-seven. In addition, many municipalities were divided.

We have no way of knowing whether the lack of compactness in the districts or the violation of the integrity of the political subdivisions resulted because of

the application of a rational state plan. The Commission has presented its conclusion that the lack of compactness and the split of political subdivisions was necessary. Why? We are not told. We have no way of knowing whether the defects resulted from arbitrary picking and choosing in various parts of the Commonwealth. A plan is not constitutionally validated by merely stating the objectives.

The majority erroneously place certain burdens upon the objectors to the submitted reapportionment plan. Once the citizen has established his denial of the equal protection of the law by showing variations in the population districts which dilute his vote, it is incumbent upon the state to establish why this prima facie denial of the equal protection in population occurred. *Wells v. Rockefeller, supra.* The citizen does not have the tools to determine whether the variations were *unavoidable* or *justified* because of the implementation of a rational plan to achieve legitimate state objectives. How can the citizen properly assess whether variations were *unavoidable* or *justified* unless he is first provided with information concerning these matters? We have no such information before the Court and it was the burden of the Commission to show that the variations were *unavoidable* or *justified.*

Because the consideration of the constitutionality of the Commission plan was before this Court just a few months before the scheduled Primary Election of 1972, I would not interfere with the conduct of the 1972 elections. This appeal has come before this Court without any undue delay on the part of the Commission or the Commonwealth. In such circumstances, I would permit the elections of 1972 to proceed under the plan submitted, but would remand the matter to the Reapportionment Commission for the drawing of a reapportionment plan which meets constitutional standards. This Court should retain jurisdiction.