[J-1-2018] [MO:Todd]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, CARMEN FEBO SAN MIGUEL, JAMES SOLOMON, JOHN GREINER, JOHN CAPOWSKI, GRETCHEN BRANDT, THOMAS RENTSCHLER, MARY ELIZABETH LAWN, LISA ISAACS, DON LANCASTER, JORDI COMAS, ROBERT SMITH, WILLIAM MARX, RICHARD MANTELL, PRISCILLA MCNULTY, THOMAS ULRICH, ROBERT MCKINSTRY, MARK LICHTY, LORRAINE PETROSKY, | : No. 159 MM 2017 <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Petitioners | : <br> : <br> : <br> : <br> : |
| v. | : <br> : <br> : <br> : <br> : |
| THE COMMONWEALTH OF PENNSYLVANIA; THE PENNSYLVANIA GENERAL ASSEMBLY; THOMAS W. WOLF, IN HIS CAPACITY AS GOVERNOR OF PENNSYLVANIA; MICHAEL J. STACK III, IN HIS CAPACITY AS LIEUTENANT GOVERNOR OF PENNSYLVANIA AND PRESIDENT OF THE PENNSYLVANIA SENATE; MICHAEL C. TURZAI, IN HIS CAPACITY AS SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; JOSEPH B. SCARNATI III, IN HIS CAPACITY AS PENNSYLVANIA SENATE PRESIDENT PRO TEMPORE; ROBERT TORRES, IN HIS CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JONATHAN M. MARKS, IN HIS CAPACITY AS COMMISSIONER OF THE BUREAU OF COMMISSIONS, ELECTIONS, AND LEGISLATION OF | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

THE PENNSYLVANIA DEPARTMENT OF :
STATE, :
:
Respondents :

## CONCURRING AND DISSENTING OPINION

**JUSTICE BAER**                                        **FILED:  February 7, 2018**

I respectfully offer this response to the Court's opinion in support of its order of January 22, 2018 (January 22nd Order).  I continue to join the Majority's conclusion that the Pennsylvania Congressional Redistricting Act of 2011 (2011 Plan) violates the Pennsylvania Constitution, as originally set forth in the first sentence of Paragraph First of the Court's January 22nd Order.  Moreover, I concur with the Majority's erudite explication of Article I, Section 5 of the Pennsylvania Constitution (the Free and Equal Election Clause), PA. CONST. art. I, § 5,[1] and the Court's ultimate conclusion that the 2011 Plan violates the rights protected by that provision.

For the reasons explained below and similar to concerns expressed by Chief Justice Saylor and Justice Mundy, I diverge from the Majority, which I read to impose court-designated districting criteria on the Legislature.  I, nevertheless, conclude that Pennsylvania's Free and Equal Election Clause protects Pennsylvanians' right to vote from dilution resulting from extreme partisan gerrymandering.  As elucidated *infra*, I would hold that extreme partisan gerrymandering occurs when, in the creation of a districting plan, partisan considerations predominate over all other valid districting

---

[1] The Free and Equal Election Clause is set forth in full *infra* at 5.

criteria relevant to the voting community and result in the dilution of a particular group's vote.[2]

In conformity with the other dissenting justices, I additionally dissent from the portions of the Majority Opinion supporting the remainder of the January 22nd Order, which enjoin the use of the 2011 Plan for the 2018 election cycle and set forth a procedure for implementing a new map for the May 2018 primary.[3] In my view, as explained below, the Court's remedy threatens the separation of powers dictated by Article I, Section 4 of the United States Constitution[4] by failing to allow our sister branches sufficient time to legislate a new congressional districting map, potentially impinges upon the due process rights of the parties at bar as well as other interested parties, and foments unnecessary confusion in the current election cycle.[5]

---

[2] Petitioners' argument on the Free and Equal Elections Clause appears to be tethered to their claim that the 2011 Plan violates the equal protection guarantees of the Pennsylvania Constitution provided in Article I, Sections 1 and 26. That being said, it is clear that Petitioners allege a violation of the Free and Equal Elections Clause, and thus, such claim is before the Court. Accordingly, I offer this opinion in response to the Majority's analysis of that clause.

[3] As I would not apply the finding of unconstitutionality to the May 2018 primary, I concur in Paragraph Sixth of the Court's January 22nd Order allowing the March 2018 special election in Pennsylvania's 18th Congressional District to be held under the 2011 Plan.

[4] Article I, Section 4 of the United States Constitution is set forth in relevant part *infra* at 4.

[5] To be precise, I concur in the Majority's comprehensive recitation of the background of this case in Part I, the description of this action in Part II, Part III's summary of the thorough proceedings in the Commonwealth Court including the factual findings and conclusions of law of Judge Brobson, and the presentation of the parties' and *amici'*s arguments in Part IV. As said, I concur with the Majority's analysis of the Free and Equal Election Clause in Part V. A. I dissent, however, from Part V. B, which I view as requiring the Legislature to utilize specified districting criteria in drafting a redistricting (…continued)

First, I address my concerns with the "measurement of compliance" discussion set forth in Part V. B, which I interpret as dictating criteria for the Legislature to utilize in redistricting. Article I, Section 4 of the United States Constitution unambiguously provides state legislatures with the authority and responsibility for regulating the election of Senators and Representatives to the United States Congress, subject to any enactment by Congress. Specifically, Article I, Section 4 provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators.

U.S. CONST. art. I, § 4. Recently, the United States Supreme Court concluded that the "legislature" designated in Section 4 includes not only the state legislative assembly but also legislative acts of the people through referenda to amend their state constitutions, such as provisions for independent commissions to draw congressional election districts.

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2659 (2015). Section 4's use of the term "legislature," however, clearly does not encompass the judicial branch, and thus, courts lack the authority to prescribe the "times, places, and manner of holding" congressional elections.

As reiterated by the Majority Opinion, this Court's January 22nd Order indicated the following:

> [T]o comply with this Order, any congressional districting plan shall consist of: congressional districts composed of compact and contiguous territory; as nearly equal in

_____

(continued…)
map, and concur only in the holding of Part V. C that the 2011 Plan is unconstitutional. Finally, I dissent to the remedy provided in Part VI.

> population as practicable; and which do not divide any
> county, city, incorporated town, borough, township, or ward,
> except where necessary to ensure equality of population.

January 22nd Order, ¶ "Fourth." The Majority ably traces the history of the adoption of nearly identical criteria by the framers of the Pennsylvania Constitution for purposes of state senatorial and representative districts. PA. CONST. art. II, § 16. Indeed, the language was also incorporated in regard to municipal election districts. PA. CONST. art. IX, §11.

In contrast to the state legislative and municipal districts, the Constitution is silent in regard to the criteria to be applied by the Legislature in establishing congressional districts for Representatives to the United States Congress. The designated criteria are also notably absent from the Free and Equal Election Clause, which with elegant simplicity, provides as follows:

> Elections shall be free and equal; and no power, civil or
> military, shall at any time interfere to prevent the free
> exercise of the right of suffrage.

PA. CONST. art. I, § 5. This language obviously does not address the size or shape of districts. Moreover, there is nothing inherent in a compact or contiguous district that insures a free and equal election, as is evidenced by claims of unconstitutional gerrymandering raised in challenges to redistricting plans of other states which employ maps created in compliance with the traditional districting criteria of compact and contiguous territory, equality of population, and minimization of municipal line division. S*ee, e.g., Whitford v. Gill*, 218 F.Supp. 3d 837 (W.D. Wis. 2016).

Accordingly, I am unwilling to engraft into the Pennsylvania Constitution criteria for the drawing of congressional districts when the framers chose not to include such provisions despite unquestionably being aware of both the General Assembly's responsibility for congressional redistricting and the dangers of gerrymandering. It is

not this Court's role to instruct the Legislature as to the "manner of holding elections," including the relative weight of districting criteria.

I nonetheless agree with the Majority's holding that the Free and Equal Election Clause protects against the dilution of votes because "a diluted vote is not an equal vote." *Id.* at 118. Moreover, I adopt the Majority's explanation of how extreme partisan gerrymandering "dilutes the votes of those who in prior elections voted for the party not in power to give the party in power a lasting electoral advantage . . . [b]y placing voters preferring one party's candidates in districts where their votes are wasted on candidates likely to lose (cracking), or by placing such voters in districts where their votes are cast for candidates destined to win (packing)." Maj. Op. at 118. Accordingly, I concur with the Majority's holding that "[a]n election corrupted by extensive, sophisticated gerrymandering and partisan dilution of votes is not 'free and equal." Maj. Op. at 130. Therefore, I conclude that the Free and Equal Clause is violated by the use of extreme partisan gerrymandering by the Legislature and Governor because it constitutes unconstitutional interference by a civil power "to prevent the free exercise of the right to suffrage" through vote dilution. PA. CONST. art. I, § 5.[6]

To evaluate a challenge to a congressional districting plan, I would hold that a challenger has the burden to prove that the plan clearly, plainly, and palpably violates the Free and Equal Election Clause by demonstrating that the plan resulted from extreme partisan gerrymandering. *Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006) (holding that a "legislative enactment will not be deemed unconstitutional unless it clearly, palpably, and plainly violates the Constitution"). I propose that extreme partisan gerrymandering can, in turn, be proven by evidence that partisan considerations

---

[6] I agree with the Majority that Pennsylvania's congressional districts must also meet the requirements set forth by the federal Constitution and related statutory enactments.

predominated over all other valid districting criteria relevant to the voting community and resulted in the dilution of a particular group's vote.

I further recognize that a fully developed record establishing the absence of traditional districting criteria is indicative of extreme partisan gerrymandering for purposes of vote dilution. As explained by the Majority, because traditional districting criteria are "fundamentally impartial in nature, their utilization reduces the likelihood of the creation of congressional districts which confer on any voter an unequal advantage by giving his or her vote greater weight in the selection of a congressional representative as prohibited by Article I, Section 5." Maj. Op. at 122. Moreover, I agree that the use of traditional districting criteria "substantially reduces the risk that a voter in a particular congressional district will unfairly suffer the dilution of the power of his or her vote." *Id.*

I do not view, however, the utilization of traditional districting criteria as dispositive in every redistricting case. A map may fail to satisfy all of the traditional criteria and yet pass constitutional muster under the Free and Equal Election Clause, such as where a district is less compact due to a dispersed community of interest. Similarly, traditional districting criteria could be satisfied in a particular case and yet a totality of the evidence could still demonstrate that partisan considerations predominated in the drawing of the map as a result of extreme partisan gerrymandering.

As occurred here, a petitioner may establish that partisan considerations predominated in the drawing of the map by, *inter alia*, introducing expert analysis and testimony that the adopted map is a statistical outlier in contrast with other maps drawn utilizing traditional districting criteria and that the adopted map was not the product of other legitimate districting considerations such as the need to protect communities of interest or promote other interests relevant to the voting community. The extensive

statistical evidence outlined in detail by Judge Brobson in the Commonwealth Court and recounted in the Majority Opinion demonstrates that the 2011 Plan resulted from extreme partisan gerrymandering and, in fact, establishes that this map is one of the most gerrymandered in the nation. On this basis, Petitioners in the case at bar clearly, plainly and palpably demonstrated that partisan considerations predominated over other relevant districting criteria in the drawing of the 2011 Plan and resulted in extreme partisan gerrymandering in violation of Pennsylvania's Free and Equal Election Clause.

As I join the Court's conclusion that the 2011 Plan violates the Pennsylvania Constitution's Free and Equal Election Clause, I turn next to the remedy provided by the Majority in the January 22nd Order, as explained in Part VI of the Majority Opinion. For the reasons set forth in my concurring and dissenting statement to the January 22nd Order, I object to the development of a new redistricting plan for the 2018 election cycle. I continue to suggest respectfully that the Court reconsider its decision given the substantial uncertainty, if not outright chaos, currently unfolding in this Commonwealth regarding the impending elections, in addition to the likely further delays that will result from the continuing litigation before this Court and, potentially, the United States Supreme Court, as well as from the map-drawing process and the litigation that process will inevitably engender.

The Majority correctly observes that "it is beyond peradventure that it is the legislature, in the first instance, that is primarily charged with the task of reapportionment." Maj. Op. at 136. Unfortunately, the Legislature does not have a fair opportunity to act "in the first instance" where it has less than three weeks to develop a plan. While it is true that the Legislature technically enacted the 2011 Plan in two weeks, it is naïve to think that the legislators created the map in that short period of time, as opposed to developing and negotiating details of the map over prior months. In

fact, the Majority observes that the Legislature began hearings on the districting map as early as May of 2011 before the December passage of the 2011 Plan, suggesting that the development of the map spanned at least eight months.  Maj. Op. at 6.

Rather than providing the General Assembly a reasonable opportunity to create a map and pass legislation to adopt it, the Majority has taken steps in preparation for the "possible eventuality" that the Legislature cannot act in this compressed time frame.  Order, 1/26/18.  Over the objection set forth in Justice Mundy's dissent, the Majority posits that state courts have the authority under United States Supreme Court precedent "to devise and impose a reapportionment plan pending later legislative action" when the legislative bodies fail to act or when "the imminence of a state election makes it impractical for [the legislature] to do so."  Maj. Op. at 134 (internal citations omitted).  After reviewing precedent from our sister states and the federal courts, the Majority opines that the precedent serves "as a bedrock foundation on which stands the authority of the state judiciary to formulate a valid redistricting plan when necessary." *Id.* at 137.

Respectfully, the circumstances at present do not make it "necessary" for this Court to formulate a redistricting plan for the impending 2018 elections.  Instead, the unambiguous grant of redistricting authority to the state legislature under Article I, Section 4 of the Federal Constitution mandates judicial restraint to allow a legislature a reasonable period of time, which should be measured in months rather than weeks, to redistrict following a determination of unconstitutionality by a court, which preferably would provide the legislative bodies with a clear understanding of the nature of the original plan's unconstitutionality.

This case does not present a situation where the election cannot go forward under the current map, such as presumably would occur if the plan provided for more

representatives than could be seated in Congress. Indeed, the current map has been utilized for three election cycles, and the Majority is allowing it to be employed again in the upcoming special election for the 18th District. It is, therefore, unnecessary to act prior to the 2018 elections.

In support of its decision to impose a judicially created map in the event that our sister branches fail to enact a plan by February 15th, my colleagues further rely upon this Court's decision in *Butcher v. Bloom,* 216 A.2d 457 (Pa. 1966). In *Butcher*, however, the Court in 1964 had provided the Legislature nearly one year to enact a valid map. *Butcher v. Bloom,* 203 A.2d 556, 573 (Pa. 1964). Only after the Legislature failed to pass a constitutional plan during that year did this Court impose a judicially-chosen map. In contrast, this Court has provided the Legislature three weeks from the initial order to produce a new map. In my view, this does not constitute a reasonable time for the Legislature to act.[7]

I also have grave concerns regarding the Court's procedure for drawing the map should the Legislature and Governor fail to produce one by the dates set forth in the January 22nd Order, and as supplemented by the January 26th Order, to which I filed a concurring and dissenting statement.[8] The Majority asserts that it has afforded all

_____

[7] Indeed, Professor Nathaniel Persily, the expert this Court engaged in its Order of January 26th, has observed that "[a] quick plan, however, is not necessarily a good plan. Indeed, a computer can draw a statewide equipopulous plan by itself in a matter of hours or even minutes, but it is unlikely to be one a court (or anyone) would want to adopt." Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147 (2005). A good redistricting plan takes time and thoughtful consideration by legislators who know the communities impacted by the plan.

[8] Despite my disagreement with the remedy provided, I concur with the Majority's clarification that, if the Legislature and the Governor agree to a plan, then this Court's "role in this matter concludes, unless and until the constitutionality of the plan is challenged." Maj. Op. at 132.

parties and Intervenors a "full and fair opportunity to submit proposed remedial plans for our consideration." Maj. Op. at 132-33. I do not agree that allowing parties to submit a map comports with due process absent their ability to respond to alternative plans, potentially by submitting additional evidence or cross-examining witnesses. Moreover, the Majority's remedy lacks any provision for the parties to object following the release of the Court's map, which may indeed be necessary to advise the Court of any potential oversights or infirmities in the map itself.[9]

Additionally, it is unclear from the Court's orders whether the Court will "adopt a plan based on the evidentiary record developed in the Commonwealth Court" as set forth in the January 22nd Order, Paragraph Third, or whether the Court will be adopting a map based upon additional evidence submitted by the parties pursuant to the January 26th Order, obtained from the Commonwealth's public databases, or from sources extrinsic to the record utilized by Professor Persily, which have not been subjected to the rigors of evidentiary challenges either for admissibility or accuracy, as tested through cross-examination. I object to the lack of transparency of this process and urge the Court to provide the parties and the public constitutionally-mandated due process by allowing an opportunity to object to any plan that the Court may adopt.

Finally, as noted in my original concurring and dissenting statement to the January 22nd Order, I have significant concerns that this Court's unnecessarily compressed timeframe may result in the "[s]erious disruption of orderly state election

---

[9] In contrast, Professor Persily has previously recommended that an ideal timeframe would provide for a court to begin drawing a map three months prior to the beginning of ballot qualification, allowing one month for development of the map and one month for hearings on the proposed map. Persily, 73 Geo. Wash. L. Rev. at 1147-48. He additionally observes that a reasonable goal would provide for "releasing the final version of a plan one month prior to the beginning of the petitioning period" to "give potential candidates sufficient notice as to the location of their districts and a reasonable time to decide whether they wish to run." *Id.* at 1147 n.88.

processes and basic governmental functions." *Butcher*, 203 A.2d at 568-69. Indeed, I fear that candidates will be harmed by the shortened time period and that voters will be confused as to their district. The litigation and resulting confusion that has ensued since the release of the January 22nd Order confirm my initial concerns.